[Civ. No. 50492. Second Dist., Div. Five. Dec. 8, 1977.]

DAN DORYON et al., Plaintiffs and Appellants, v.
MARVIN SALANT et al., Defendants and Respondents.

708

**COUNSEL**

Harold Rostow for Plaintiffs and Appellants.

Milton R. Gunter, Jonathan Greenspan and Sydney Halem for Defendants and Respondents.

**OPINION**

**KAUS, P. J.**—Plaintiffs Dan and Vicky Doryon brought an action for specific performance against Marvin and Cecile Salant. After a court trial, judgment was entered in favor of defendants.[1]

## FACTS

This dispute involves residential property located at 6211 West Fifth Street in Los Angeles. Defendants retained Ginza Realty to sell the house. On August 20, 1974, plaintiffs signed a form "Offer to Purchase & Deposit Receipt" which provided:

---

[1]The real estate brokers involved also filed an action against defendants. The two cases were consolidated for all purposes. The brokers also lost. They have not appealed.

Plaintiffs agreed to buy the property for $65,000. They paid Ginza Realty a deposit of $1,000 and agreed to deposit an additional $2,000 "at opening of escrow . . . within 5 days from date hereof," and an additional $10,000 before the close of escrow—a total down payment of $13,000. The offer was "subject to buyer obtaining a 1st trust deed and note for $52,000 payable at $490.97 per month . . . for a period of 25 years at 10½ percent interest or less." The parties agreed "to enter into a 60 day escrow and to sign all necessary escrow instructions within 5 days from the date hereof." The offer also provided: "Time is of the essence of this contract but time for any act required to be done may be extended not longer than thirty days by the undersigned broker."

On August 27, defendants made a counteroffer which raised the purchase price to $68,500, and provided that the buyers would have "21 working days from opening of escrow to obtain a 1st trust deed and note, . . ." The preprinted counteroffer also provided: "OTHER TERMS: All other terms to remain the same."

Plaintiffs signed and accepted the counteroffer on August 28, 1974.

The deposit receipt also provided—in the preprinted portion—that Crestview Escrow would handle the escrow. However, on August 29 or 30 when the Ginza agent went to defendants' house to tell them that the counteroffer had been accepted, defendant Marvin Salant said that he did not want Crestview to handle the escrow, but that he wanted a bank of his choice, which bank he had not decided upon. On September 3, the agent opened an escrow at a branch of the Security Pacific Bank nearest defendant's house. The Security Bank typed up escrow instructions. The agent brought the instructions to plaintiffs who promptly signed them. These instructions included the provision that $1,000 would be deposited in escrow by Ginza Realty and $2,000 would be deposited "upon signing of these instructions."

On September 4, 1974, plaintiffs gave the Ginza agent a check for $2,000 payable to Ginza. However, it was not until September 17 that Ginza deposited even $1,000 in escrow. No other amounts were deposited in escrow. Ginza apparently deposited plaintiffs' $2,000 check in its trust account. The sellers never signed the escrow instructions. On September 17, 1974, plaintiffs obtained a commitment from a savings and loan institution for a $51,000 loan.

On September 19, plaintiffs signed supplemental escrow instructions which recited the terms of the loan commitment and added: "This

complies with all requirements of this escrow for Buyer to obtain a new loan and the contingency regarding same as set out [in the] original escrow instructions dated September 3, 1974 is hereby deleted."

Between September 17 and October 1, the Ginza salesman repeatedly called defendants to ask them to sign the escrow instructions. Defendants stalled. First they wanted to know the exact cost of the termite report. Then there was a further delay because their attorney allegedly had "the papers" and was out of town for several days. Defendants never stated that they would not sign the escrow instructions, but on October 1, their attorney wrote Ginza that they would refuse to do so, because the fair market price of the property was $71,500 and Ginza had negligently undervalued it.

At trial, defendant Marvin Salant was asked the reason that he did not sign the escrow instructions. His response was: "We thought the price was too low."

At the end of plaintiffs' case, defendants moved for judgment under section 631.8 of the Code of Civil Procedure. The sole basis for their motion was that, since Ginza was not a licensed escrow agent, plaintiffs had breached the contract by paying the $2,000 deposit to Ginza, rather than into the escrow. Although the court thought that "if morality were involved here, or good faith or things of that sort, I might be tempted to consider the urgings of the plaintiffs, who I feel are in good faith and desired very much to have this property, and maybe deserve to get it," it felt compelled to grant the motion, though not on the ground urged by defendants. The court's reason as stated from the bench and elaborated in a later written memorandum, was that the plaintiffs' offer and the defendants' counteroffer, though accepted by plaintiffs, did not constitute a contract. The court fastened onto the fact that the counteroffer had raised the purchase price from $65,000 to $68,500 leaving, in the court's view, a gap of $3,500, with no provision on how it would be paid or financed. "It cannot be presumed, in the absence of evidence, that the sellers wanted the added $3,500 to be paid them in cash. It might not, for example, have been in their interest tax-wise to do so. The terms of sale were vital to the sellers as well as to the purchasers, and the form of such payment to them is not spelled out in the documents, . . ."

Defendants then submitted proposed findings of fact which included a finding that plaintiffs were "neither ready, willing or able purchasers of the real property." Plaintiffs filed written objections to the proposed

findings, pointing out specifically that this finding was not supported by the evidence. No such finding appears in the findings which the court eventually did sign. Those are to the effect that (1) the contract between the parties "lacks essential terms relative to manner of payment of the contract price and does not constitute an enforceable contract in that it cannot be determined from the contract, or from any other evidence, how much of the price was to be in cash, and how much from the first trust deed," and (2) that plaintiffs had breached the contract because the escrow was opened one day late—September 3 instead of September 2—and no cash was deposited in escrow until September 17.

## DISCUSSION

The court's findings are not supported by the evidence and are contrary to law.

### *Enforceable Contract*

█ The trial court erred in finding that the purported contract lacked "essential terms relative to the manner of payment of the contract price, . . ."

In a real property transaction, the "material factors to be ascertained from the written contract are the seller, the buyer, the price to be paid, the time and manner of payment, and the property to be transferred, describing it so it may be identified. [Citations.]" (*King* v. *Stanley* (1948) 32 Cal.2d 584, 589 [197 P.2d 321].)

Those factors were satisfied here. The purchase price, payable by the close of escrow, was $68,500. The sale was, as to the sellers, a cash sale. █ The provision in plaintiffs' offer that made the sale subject to their being able to obtain a $52,000 loan, was solely for plaintiffs' benefit; if unable to obtain the loan, their performance was excused.[2] Defendants' sole right was that within the 21-day period from

---

[2]Although the two documents comprising the contract—the offer and the accepted counteroffer—leave no doubt that defendants were to receive the purchase price in cash, it is conceivable that the phrase in the counteroffer "all other terms to remain the same" could be interpreted to affect the amount of the loan which was a condition precedent to plaintiffs' performance. We note that $52,000 is exactly 80 percent of $65,000. Had plaintiffs insisted, it would not have been irrational for them to claim that they were excused from performing unless they were able to obtain a loan of $54,800—80 percent of $68,500. Although the trial court was quite correct in holding that the question whether a contract is certain must be determined as of the time it is made and that a fatal

opening an escrow, the buyers use due diligence to obtain the proposed financing, (*Abrams* v. *Motter* (1970) 3 Cal.App.3d 828, 837-838 [83 Cal.Rptr. 855]) so that $68,500 in cash would be available at the close of escrow. Defendants would have had no complaint if plaintiffs had elected to forego financing altogether and to pay the purchase price with their own cash.

In short, when plaintiffs signed the supplemental escrow instructions on September 19—well within the 21-day period—to the effect that they were satisfied with the $51,000 loan commitment they had obtained, they waived any condition precedent to their performance and defendants were contractually assured of obtaining the full purchase price in cash. That was the full extent of their rights in the matter.

■ "[A] contracting party may waive provisions placed in a contract solely for his benefit. [Citations.]" (*Spellman* v. *Dixon* (1967) 256 Cal.App.2d 1, 4 [63 Cal.Rptr. 668]; see also *Wesley N. Taylor Co.* v. *Russell* (1961) 194 Cal.App.2d 816, 828 [15 Cal.Rptr. 357], and cases collected; *Pease* v. *Brown* (1960) 186 Cal.App.2d 425, 429 [8 Cal.Rptr. 917]; *Groobnan* v. *Kirk* (1958) 159 Cal.App.2d 117, 126 [323 P.2d 867]; *Johnson* v. *Lehtonen* (1957) 151 Cal.App.2d 579, 581 [312 P.2d 35], and cases discussed.)[3]

---

uncertainty cannot be waived (*White Point Co.* v. *Herrington* (1968) 268 Cal.App.2d 458, 469 [73 Cal.Rptr. 885]), this possible ambiguity—$52,000 versus $54,800—was not fatal. Had defendants made an issue of it—which they did not—this ambiguity could easily have been resolved by evidence of custom and usage. (*Burrow* v. *Timmsen* (1963) 223 Cal.App.2d 283, 288 [35 Cal.Rptr. 668, 100 A.L.R.2d 544]; see generally *Wong* v. *Di Grazia* (1963) 60 Cal.2d 525, 539 [35 Cal.Rptr. 241, 386 P.2d 817].) "If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filing of some gaps that the parties have left." (1 Corbin on Contracts (1963) § 95, p. 400.)

[3]A somewhat perplexing case is *Magna Development Co.* v. *Reed* (1964) 228 Cal.App.2d 230 [39 Cal.Rptr. 284]. There the parties entered into an agreement for the sale of property which provided that the seller would take back a deed of trust, which deed of trust would be subordinated to a construction loan (228 Cal.App.2d at p. 235, fn. 3). The subordination clause was concededly totally lacking in specifics. (*Id.,* at p. 236.) The buyers, however, asserted that they were entitled to specific performance because they had eliminated any uncertainty by waiving the benefit of the clause. The court disagreed, noting, first, that the waiver was "no more than a conditional waiver of the subordination provision made on the eve of a summary judgment procedure," and second, "if a party were permitted to waive defective provisions going to the essence of a contract, the court, in effect, would be allowing the unilateral creation of a new, different contract." (*Id.,* at p. 242.) The court pointed out that the cases relied on by the buyers—which we have discussed above—"deal with the waiver of a conditional right of the vendee, which, if allowed, leaves the contract an enforceable obligation according

*Wesley N. Taylor Co.* v. *Russell, supra,* 194 Cal.App.2d 816, is very similar to this case. There, the defendant seller entered into an agreement with the prospective buyers, which agreement was contingent on the buyers being able to obtain a 15-year, 6 percent $50,000 mortgage. The buyers were able to obtain only a 12-year mortgage; this was, however, agreeable to them. (194 Cal.App.2d at pp. 825-826.) Still, the seller refused to perform. In holding that the real estate brokers retained by the defendant seller were entitled to their commission, the court ruled: "It is generally held that a provision of the type here involved, one which by its terms is contingent upon the ability of the buyer to obtain a loan, is inserted for the buyer's benefit 'so that he would not be liable for breach of contract unless he could borrow the money with which to pay for the land. He was at liberty to waive the benefit of this clause and to assume an unconditional obligation to fulfill the contract. This he did by filing his bill, so that there is now complete mutuality between the parties.' " (*Id.,* at p. 828.)

The court then listed a series of cases which held that "such a provision is for the sole benefit of the vendee; that the vendor's interest is in securing the purchase price; that the paramount obligation of the respective parties is the payment of the cash and the delivery of title to the property, and that the method of financing is incidental and not of the essence of the contract to convey." (*Id.,* at pp. 828-829.)[4]

### Breach by Plaintiffs

■ The trial court found that because the escrow was opened one day late and the contract "makes time of the essence," plaintiffs' failure to deposit $2,000 into escrow within five days of the date of the agreement "constituted a failure to perform two conditions of the contract by Plaintiffs or was a breach thereof."

---

to its own terms as agreed upon by the parties." (*Id.,* at p. 243.)

One commentator has interpreted *Magna* to turn on the "conditional nature of the waiver, . . ." (Hetland, Secured Real Estate Transactions (Cont.Ed.Bar) § 3.19, pp. 68-69.) If so, the language seems unnecessarily broad.

[4]Cases in which the buyer is permitted to waive a provision inserted solely for his benefit are to be distinguished from cases such as *Spangler* v. *Castello* (1956) 147 Cal.App.2d 49 [304 P.2d 752]. There the sales agreement provided that the *seller* would take back the $48,000 trust deed. The sale was contingent on the parties obtaining FHA and VA approval. This approval could not be obtained. When the seller refused to consummate the sale, the buyer asserted that the approval provision was for his benefit and that he was willing to waive it. The trial court found and the court of appeal affirmed the finding that the approval was also for the benefit of the seller, whose security would be adversely affected by the lack of FHA and VA approval. (*Id.,* at p. 52.)

We leave aside the issue whether a day's delay in opening an escrow, even in a contract in which time is of the essence, would justify the seller's total failure to perform. The fact is that the court saddled plaintiffs with defendants' own breach.

Although the purchase offer provides that the purchaser will deposit $2,000 "at opening of escrow," and that the purchaser and seller agreed to sign all necessary instructions "within 5 days of the date hereof," the agreement itself does not spell out who was to "open the escrow." The evidence, however, makes clear that the agent retained by defendant sellers undertook to open the escrow and that had defendants been willing to use the escrow specified in the agreement, there would have been no difficulty in doing so within five days; rather, according to the agent, "it would have been a 10-minute telephone call." Further, the evidence shows that plaintiffs had no objection to using Crestview Escrow—or any other escrow—but that the delay in opening the escrow was caused solely by defendant's insistence that he wanted the escrow to be handled by "a bank of his choice, . . ." Moreover, the provision that time was of the essence was qualified: "[A]ny act required to be done may be extended not longer than thirty days by the undersigned broker"—the very agent who undertook to handle the escrow.

Thus, if the one-day delay was a breach, it was caused by defendants. More reasonably, it was no breach at all.

Similarly, there is also no evidence whatsoever that plaintiffs were delinquent with respect to depositing $2,000 into escrow. It is not disputed that on September 4, they gave the Ginza agent a $2,000 check, payable to Ginza, which he deposited in a Ginza trust account, intending to deposit the amount in the escrow. Ginza was defendants' agent and had undertaken to handle the escrow. There is no legal basis for visiting Ginza's sins on plaintiffs.

### Disposition

The trial court's findings do not support the judgment and there must be a retrial. For the benefit of the parties we address an issue only obliquely mentioned in the briefs.

The basic rule is, of course, that in an action for specific performance the plaintiff must allege and prove that he was ready, willing, and able to perform. (*Am-Cal Investment Co.* v. *Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 539 [63 Cal.Rptr. 518]; *Pike* v. *Von*

*Fleckenstein* (1962) 203 Cal.App.2d 134, 136-137 [21 Cal.Rptr. 390].) Plaintiffs' first amended complaint on which the case was tried contains no such allegation.[5]

Nevertheless, abundant evidence on these issues was received. (*Estate of Pieper* (1964) 224 Cal.App.2d 670, 680 [37 Cal.Rptr. 46].) There could, of course, be no question concerning plaintiffs' readiness and willingness—the problem, if any, was their ability to pay the cash differential between the loan commitment and the purchase price. On that issue there was evidence that plaintiffs had about $19,000 in cash or in bank accounts, an equity of between $11,000 and $16,000 in their home, a life insurance policy with a cash surrender value of about $3,000 and that they were the owners of a going business which they valued at $50,000. They estimated their total net worth at $98,700.

These figures did not necessarily have to be believed by the trial court.[6] We cannot, however, save the judgment by inferring a finding that was never made; not only would such a finding be at odds with the trial court's remarks concerning plaintiffs' "good faith" but more specifically that was the precise finding which defendants submitted to the trial court and which, after objection by plaintiffs, the trial court did not make.[7]

The judgment is reversed.

Stephens, J., and Hastings, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied February 1, 1978.

---

[5]The complaint merely alleges that plaintiffs "duly performed all the conditions of said agreement on their part to be performed precedent to conveyance of said property . . . ."

[6]The evidence concerning plaintiffs' assets, liquid and otherwise, found its way into the record largely through the written exhibits in connection with plaintiffs' loan application.

[7]Oddly enough, in the consolidated action by the broker, the trial court did find that the broker had not produced "a ready, willing, and able buyer for the subject property." This finding must, however, be interpreted in light of the court's written opinion which included this paragraph: "From the point of view of the broker, who alleges he produced a ready, willing, and able buyer, there was no evidence that a loan commitment in excess of $52,000 could have been obtained on the property, or that the buyer was willing to make a down payment in excess of $13,000 in cash." This finding, therefore, directly relates to the basic legal and factual errors. Legal: that there was no contract. Factual: that the September 19, supplemental escrow instruction was not an expression of willingness to make a down payment in excess of $13,000.