[No. B006864. Second Dist., Div. Seven. June 17, 1986.]

JAMES A. HENNEFER et al., Plaintiffs and Respondents, v.
DAN BUTCHER, Defendant and Appellant.

496

**COUNSEL**

Dudley Gray, Norman Miller, Owen D. Petersen and Edward J. Horowitz for Defendant and Appellant.

Allen, Matkins, Leck, Gamble & Mallory, Alfred E. Augustini and Anne Cole-Pierce for Plaintiffs and Respondents.

**OPINION**

**THOMPSON, J.**—Seller Dan Butcher appeals from the judgment awarding buyers James A. Hennefer and Robert N. Klein II specific performance of a contract to sell 4.85 acres of vacant land in Torrance. Seller contends that the trial court erred in (1) ordering specific performance because the contract was too ambiguous; (2) determining seller's right to a "premium payment"; and (3) failing to add interest on the purchase price as an offset to damages awarded buyers for delay. Buyers controvert these contentions and further claim that (4) the appellate court should correct a mathematical error in the judgment, and (5) assess damages for a frivolous appeal. For the reasons that follow, we will modify the judgment to correct the clerical error and, as modified, affirm the judgment.

*Procedural and Factual Background*

The evidence, viewed in the light most favorable to the judgment (*Ellison v. Ventura Port District* (1978) 80 Cal.App.3d 574, 581 [145 Cal.Rptr.

665]), shows that seller in bad faith repudiated his agreement to sell buyers the land which was needed for buyers' condominium project after buyers were successful in obtaining approval of rezoning.[1] In October 1977, buyers and seller signed a written contract which provided, among other things, for sale of the property for $760,000. In April 1978, seller sent a letter cancelling escrow.

Subsequent negotiations led to the parties signing "Addenda of May 26, 1978 Amending Escrow Instructions," which modified the original contract and, inter alia, increased the purchase price to $1,050,000. The agreement provided that buyers would have 120 days from June 1, 1978, "to obtain approval of final zoning," i.e., the city council's vote approving the complete package of applications for zoning change. Buyers could obtain additional monthly extensions to get this approval upon paying $5,000 for the first and $10,000 for each additional. The addenda agreement also provided for a "premium payment" or bonus in "consideration of the especially long escrow" if the property were rezoned and its "as-is appraised value" after rezoning was higher than the $1,050,000 purchase price based on a three-appraiser procedure at the time escrow would close. Escrow was to close 60 days after zoning became final.[2]

Buyers made extension payments for October, November and December 1978 and thus had until January 1, 1979, to obtain the city council's approval of final zoning. On December 19, 1978, the approval of final zoning was achieved with the city council's unanimous approval of buyers' conditional use permit and tract map applications. A December 21 letter from buyer Hennefer so notified seller. However, on January 11, seller wrote escrow wrongfully cancelling the escrow and May addenda agreement, claiming that buyers should have paid an additional $10,000 to extend the escrow to

---

[1]The zoning in the area had been in issue for many years. The city had previously declared a moratorium and downzoned from residential to light industrial a large area including this property owned by seller and adjacent parcels owned by OGO Associates which wanted to build a federally assisted high density low income project. OGO's lawsuit against the city was dismissed but the appellate court reversed the dismissal. However, in the interim, OGO lost its federal funding. OGO assigned its damage action to buyer Klein who pursued it with buyer Hennefer as the attorney. In 1977, Klein and the city sought to resolve the litigation on the basis that buyers would try to acquire parcels for redevelopment of the entire downzoned strip with low density luxury condominiums to serve as a buffer between existing industrial and residential areas and in exchange, the city would reconsider zoning for the strip as a whole. Seller's land was one of the parcels of land which buyers sought to acquire. Buyers planned to develop four parcels on the strip separately with this property being the first development.

[2]The addenda also contained provisions that no action for specific performance or damages might be instituted until the buyers performed and the addenda provisions would control against any other conflicting provisions in other writings.

February. Seller refused to convey the property unless buyers increased the purchase price and paid cash.[3]

Meanwhile, buyers had been preparing to close escrow and negotiating with lenders, including Citizens Savings and Loan. In March 1979, Citizen's appraiser, Mr. Emmi, prepared a written appraisal of the property which was also sent to seller. This appraisal evaluated the as-is value of the land rezoned as $1,003,000.

As a result of seller's refusal to close escrow and convey, buyers had to change their plans and develop a different parcel of the project first. Also during the litigation herein, necessary governmental approvals, such as buyers' conditional use permit and tentative tract map, expired.

Buyers sued seller, electing to proceed at trial for specific performance of the May 1978 addenda, plus incidental damages resulting from the delay. Buyers' allegation in the verified complaint that the consideration was fair and reasonable was not controverted in the answer. At trial, in addition to other witnesses, buyers called Emmi and seller called Hill, another appraiser, as expert witnesses on the as-is value of the land.

The trial court, in its oral ruling from the bench, found in favor of buyers that the contract was specifically enforceable, the buyers' damages were $150,000 and Emmi's appraisal was reasonable and would be relied on. In the court's subsequent statement of decision, the court stated that the essential terms of the agreement were fair and reasonably definite, and any ambiguities in the terms were caused by seller, and resolved against him pursuant to properly admitted parol evidence. The court found the purchase price to be $1,050,000 and the Emmi appraisal of $1,003,000 to be the proper as-is land value under the agreement. Since the seller had not objected to the court deciding the issue, the court accordingly concluded that there was no premium due under the agreement and the appraisal provisions were moot. The court also explained that its award of $150,000 to buyers for incidental damages due to delay included $50,000 reimbursement for direct expenses to obtain the governmental approvals which expired solely due to seller's refusal to convey the property and $100,000 reimbursement for carrying costs during the time it would take to reobtain these necessary but expired approvals.

The judgment which was entered provided in pertinent part that seller was directed to convey title to the subject property to buyers and, in ex-

---

[3]Buyers subsequently waived all financing arrangements and in March 1979 did agree to pay all cash.

change, buyers shall "(1) deliver to Safeco [the escrow] a letter directing Safeco to remit to defendant [seller] the sum of $1,000 previously deposited by plaintiffs [buyers] in the account of defendant [seller]; and (2) pay to defendant [seller] the sum of $949,000.00 by bank check, said sum representing the total balance of the purchase price due to defendant [seller] from plaintiffs [buyers]."

This appeal by seller followed.

I

*Specific Performance*

Although seller concedes that substantial evidence supports the trial court's findings as to the meaning of the various ambiguous provisions of the contract, seller contends that the extensive amount of ambiguities precludes an award of specific performance. We disagree.

We recognize that the Civil Code provides that the court cannot specifically enforce "[a]n agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable." (Civ. Code, § 3390, subd. 5.) But in determining whether the material factors in a contract are sufficiently certain for specific performance, the modern trend of the law favors carrying out the parties' intention through the enforcement of contracts and disfavors holding them unenforceable because of uncertainty. (*Burrow* v. *Timmsen* (1963) 223 Cal.App.2d 283, 288 [35 Cal.Rptr. 668, 100 A.L.R.2d 544]; Cal. Real Property Remedies Practice (Cont.Ed.Bar 1982) § 5.9, p. 152.)[4] The defense of uncertainty has validity only when the uncertainty or incompleteness of the contract prevents the court from knowing what to enforce. (*Crescenta Valley Moose Lodge* v. *Bunt* (1970) 8 Cal.App.3d 682, 689 [87 Cal.Rptr. 428]; *Henderson* v. *Fisher* (1965) 236 Cal.App.2d 468, 477 [46 Cal.Rptr. 173].) We are satisfied that properly admitted extrinsic evidence rendered the material contract provisions herein sufficiently definite for enforcement.

Neither law nor equity requires that every term and condition of an agreement be set forth in the contract. (*King* v. *Stanley* (1948) 32 Cal.2d 584, 588 [197 P.2d 321]; *Burrow* v. *Timmsen, supra,* 223 Cal.App.2d at p. 288.) "The usual and reasonable terms found in similar contracts can be

---

[4]Although courts often say that more certainty is required in a suit for specific performance than in an action for damages, this rule is of doubtful practical significance, for in the large majority of California cases in which it is invoked the contract was also too uncertain to support an action for damages. (See 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 41, p. 5266.)

looked to, unexpressed provisions of the contract may be inferred from the writing, external facts may be relied upon, and custom and usage may be resorted to in an effort to supply a deficiency if it does not alter or vary the terms of the agreement." (*Ibid.*) "If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." (1 Corbin on Contracts (1963) § 95, p. 400; *Larwin-Southern California, Inc.* v. *JGB Investment Co.* (1979) 101 Cal.App.3d 626, 641 [162 Cal.Rptr. 52]; *Doryon* v. *Salant* (1977) 75 Cal.App.3d 706, 712, fn. 2 [142 Cal.Rptr. 378].)

■ Parol evidence which does not vary or contradict the written terms of the contract is admissible to explain ambiguities or give meaning and content to words used, provided it does not vary or contradict the terms of the contract. (*McKeon* v. *Santa Claus of California, Inc.* (1964) 230 Cal.App.2d 359, 363-364 [41 Cal.Rptr. 43]; Cal. Real Property Remedies Practice, *supra,* § 5.9, p. 152.) Even when the uncertainty of a written contract goes to "'the precise act which is to be done' (Civ. Code, § 3390), extrinsic evidence is admissible to determine what the parties intended. [Citations.] It is only when the extrinsic evidence fails to remove the ambiguity that specific performance must be refused." (*Crescenta Valley Moose Lodge* v. *Bunt, supra,* 8 Cal.App.3d at p. 689.)

■ In a real property transaction, the "material factors to be ascertained from the written contract are the seller, the buyer, the price to be paid, the time and manner of payment, and the property to be transferred, describing it so it may be identified." (*King* v. *Stanley, supra,* 32 Cal.2d at p. 589; *Doryon* v. *Salant, supra,* 75 Cal.App.3d at p. 711.)

■ Here, the buyers and seller are clearly identified and the particular parcel of property consisting of 4.58 acres in Torrance is specifically described. As construed by the court and supported by the written terms of the contract and credible testimony presented by the buyers at trial, the purchase price is $1,050,000.

With the aid of such extrinsic evidence, the court also clarified the ambiguities regarding the time and manner of payment. Seller points to the hotly contested phrase "after zoning becomes final" in the first paragraph concerning time of payment of balance of purchase price. But the uncertainty was eliminated by the court's interpretation based on testimony at trial that the phrase meant after an ordinance was passed embodying approval of final

zoning.[5] Any ambiguity regarding the provision in paragraph 4 for payments for 30-day extensions was also clarified at trial. It was agreed by stipulation of the parties that the 30-day extensions meant one-month extensions. Moreover, the testimony at trial supports the court's finding in favor of the seller that the three extension payments made by buyers were not to be credited against the total purchase price. Furthermore, we need not reach seller's complaint about any ambiguity with respect to the time and manner of payment of any premium or the second trust deed because it was determined on the basis of Emmi's appraisal testimony that no premium payment is due, the purchase price being greater than the as-is appraised value, and the buyers are paying all cash.

Nor was the court required to construe all ambiguities against the buyers and deny specific performance because they were attorneys. The parties on both sides in this action were sophisticated with respect to commercial real estate development. While buyer Hennefer was a practicing attorney and buyer Klein a developer, the seller (Butcher) was an experienced local contractor, builder and real estate broker who had been engaged in real estate dealings for 20 years. Substantial evidence supports the court's finding that the ambiguous provisions were inserted in the contract at the seller's behest and therefore should be construed against him. Accordingly, the trial court did not abuse its discretion in ordering specific performance.

## II

### Premium Payment Issue

Seller next contends that even if specific performance were permissible, the trial court erred in determining the right to the "premium payment" due under the contract at trial by relying solely on buyers' appraiser rather than by ordering the parties to carry out the three-appraiser procedure established by the May 1978 contract.[6]

---

[5]The zoning became final in this case on March 13, 1979. The term "approval of final zoning" meant the vote of the city council approving the buyers' application for R-TH zoning which occurred on December 19, 1978.

[6]The premium payment provision in the May addenda provided in pertinent part that "Buyer shall pay in addition to the [$1,050,000], a premium payment to Seller, which shall be calculated to be the difference between the amended sale price for the subject property of $1,050,000.00 and the as-is appraised value of the subject property as determined by the construction lender or any financial institution lending against the land . . . . [¶] The lender appraisal will be delivered to the seller within 15 days after zoning becomes final. If seller disapproves appraisal within 15 days of delivery, seller and buyer shall each appoint an appraiser within 7 days. Those appraisers shall appoint a third appraiser within 7 days. All three appraisers shall produce MAI or SRA appraisals within 30 days. The appraisals shall be averaged and the seller shall, within 7 days, select the higher of the lender appraisal or the averaged appraisal."

Seller, however, chose to litigate this premium payment issue instead of relying on the appraisal procedure set forth in the provision of the agreement and will not be heard to complain now. ■ Where a trial is held upon the theory by all the parties that certain issues are before the trial court, upon appeal a party will not be heard to urge for the first time that such issues were not properly before the trial court. (*Calhoun* v. *Davis* (1953) 121 Cal.App.2d 167, 171 [262 P.2d 620]; see also *Vaughn* v. *Jonas* (1948) 31 Cal.2d 586, 605 [191 P.2d 432].)

■ During the trial, the premium payment appraisal issue was treated as an issue properly before the court for resolution. Thus, the trial court could properly find that the seller had not objected to the court determining the amount of the bonus or premium payment due, if any, under the addenda and decide that issue by ruling that the proper as-is land value of the property under the May 1978 agreement was that of the Emmi appraisal for $1,003,000. As the court concluded, there was, therefore, no bonus premium due under the agreement and its findings and decision rendered the agreement's appraisal provisions moot.

The contractual right to an appraisal procedure, like the analogous right to arbitration (see Code Civ. Proc., § 1280, subd. (a)), can be waived. ■ Waiver may result from various kinds of conduct; there is no single test. (See *Davis* v. *Blue Cross of Northern California* (1979) 25 Cal.3d 418, 426-427 [158 Cal.Rptr. 828, 600 P.2d 1060].) It may properly be implied from conduct which is inconsistent with the exercise of that right. (See *McConnell* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1980) 105 Cal.App.3d 946, 951 [164 Cal.Rptr. 751].) ■ Waiver of such a right is ordinarily a question of fact and determination of this question, if supported by substantial evidence, is binding on an appellate court. (See *Doers* v. *Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 185 [151 Cal.Rptr. 837, 588 P.2d 1261].)

■ "[J]udicial *litigation* of the merits of arbitrable issues . . . waives a party's right to arbitration." (*Id.*, at p. 188; italics in original.) ■ Here, seller joined buyers in judicially litigating the merits of this appraisal issue and objected only after the court reached a judgment on the merits against him with respect to the right to a premium payment. Without objection by seller, buyers called as an expert witness, Emmi, an appraiser for Citizen's, a potential lender against the land, who had prepared a written appraisal of the property in March 1979. Emmi testified that the "as-is appraised value" of the property, rezoned, as of March 12, 1979 was $1,003,000. This was $47,000 less than the purchase price. In addition to cross-examining Emmi, seller then called his own expert, Hill, who testified and submitted in evidence a written appraisal that the as-is raw land value

of the property in March 1979 was $2,525,610. Additionally seller's counsel during closing argument and cross-examination of buyer Klein and buyers in their trial brief indicated that one of the issues before the court was the as-is value of the property at that time.[7]

Thus, there is substantial evidence in the record that seller waived his right to the appraisal provision and fully litigated the issue of the premium payment below in the hope that the trial court would adopt his contention that he was entitled to a premium payment of $1,475,610.

Seller, however, argues that failing to object to buyers' expert appraiser and presenting his own expert appraiser did not constitute a waiver because that evidence was necessary and pertinent to the issue of the fairness and reasonableness of the contract price. ▪▪▪ It is of course true that a party seeking specific performance must allege and prove reasonableness and adequacy of consideration. (See Civ. Code, § 3391; *Stiles* v. *Cain* (1901) 134 Cal. 170, 171 [66 P. 231]; *Meyer* v. *Benko* (1976) 55 Cal.App.3d 937, 945 [127 Cal.Rptr. 846]; see also 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 740, at p. 187.) ▪▪▪ But the fairness and reasonableness of the price was not an issue at trial.

In his verified answer, seller did not deny buyers' allegation in their verified first amended complaint that "[t]he consideration named in said Addenda of May 26, 1978, of $1,050,000 plus bonus, as the total price to be paid by [buyers] for subject real property was at time of execution of said Addenda the fair and reasonable value of subject real property and said Addenda, was, as to the [seller], just and reasonable." Code of Civil Procedure section 431.20 provides that "[e]very material allegation of the complaint . . . not controverted by the answer, shall, for the purposes of the action, be taken as true." "Total failure to deny a material allegation necessarily results in an admission." (5 Witkin, Cal. Procedure, *supra,* Pleading, § 973, p. 404.) The effect of this admission was, first, to relieve the plaintiff buyers from the necessity of offering evidence to support the allegation of adequate, fair and reasonable consideration and, second, to preclude the defendant seller from offering evidence to challenge it. (*Id.,*

---

[7]In closing argument, seller's counsel argued that the court should adopt Hill's appraisal, claiming that even using alternative figures mentioned by Emmi, the valuations of Emmi and Hill "are right in the ball park . . . . [n]o real difference" and amounted to over $2.3 million. In attempting to justify cross-examining Klein regarding the selling price of other condominiums, seller's counsel argued to the court such questioning was probative because "one of the issues here is the as-is land value at the time that escrow was to close. . . ." And in their trial brief at the end of their summary of the factual background, buyers referred to the Emmi appraisal and specifically requested that "in the event that specific performance is granted in this action, such decree of specific performance should specify that no bonus payment is due and owing from [buyers] to [seller] pursuant to the 5-26-78 contract."

at pp. 403-404.) Thus, the evidence by the expert appraisers with respect to the as-is value of the raw land in March 1979 was obviously offered and received into evidence for the purpose of determining what premium payment, if any, was due. Accordingly, the trial court did not abuse its discretion in deciding that issue.

## III

### *Offset for Interest*

 Seller further contends that the trial court erred in reducing the purchase price by the amount of buyers' incidental delay damages without offsetting the interest the seller lost on the purchase price because of the delay. Seller raises this issue for the first time on appeal.

 ██ ██ Seller relies on specific performance cases in which the buyer sought and was awarded rents and profits and the defaulting seller sought to offset against the profits interest on the purchase price in the trial court.[8] Buyers herein, however, did not seek incidental compensation for lost rents and profits. Rather, they sought only delay damages for increased developmental costs in order to reobtain governmental approvals which had expired because of seller's wrongful conduct. In any event, assuming without deciding that seller might have been entitled to offset lost interest on the purchase price up to the $150,000 delay damages, seller waived that issue by failing to raise it in the trial court.

As a general rule an appellate court will consider only such points as were raised in the trial court, and this rule precludes a party from asserting, on appeal, claims to relief not asserted or asked for in the court below. (*Hayward Lbr. & Inv. Co.* v. *Ford* (1944) 64 Cal.App.2d 346, 353 [148 P.2d 689]; see also 9 Witkin, Cal. Procedure, *supra,* Appeal, §§ 311, 315, pp. 321, 326.) Although an appellate court may exercise its discretion to

---

[8]A buyer entitled to a decree of specific performance is also ordinarily entitled to a judgment for the rents and profits from the time he was entitled to a conveyance as a credit against the purchase price. Because the guiding principle is to relate the performance back to the date set in the contract, the court gives the complainant credit for any losses occasioned by the delay and permits the defendant to offset such amounts as may be appropriate. (*Ellis* v. *Mihelis* (1963) 60 Cal.2d 206, 219-220 [32 Cal.Rptr. 415, 384 P.2d 7]; *Stratton* v. *Tejani* (1982) 139 Cal.App.3d 204, 212 [187 Cal.Rptr. 231].) Thus, the buyer must reduce his credit for rents and profits by a sum equivalent to the value of his use of the retained purchase money during the delay. Moreover, "any award to the seller representing the value of his lost use of the purchase money cannot exceed the rents and profits awarded to the buyer, for otherwise the breaching seller would profit from his wrong." (*Id.*, at p. 213; *D-K Investment Corp.* v. *Sutter* (1971) 19 Cal.App.3d 537, 549 [96 Cal.Rptr. 830].) "The result is more like an accounting between the parties than like an assessment of damages." (*Ellis* v. *Mihelis, supra,* 60 Cal.2d at p. 220.)

consider a point for the first time on appeal where the point involves a pure question of law determinable from uncontroverted facts (see *Redevelopment Agency* v. *City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633]), we decline to make an exception here where this theory of damages or offset was not raised below. (See *Lundquist* v. *Marine Engineers Beneficial Assn.* (1962) 208 Cal.App.2d 390, 396 [25 Cal.Rptr. 250].) Unlike *Wilson* v. *Lewis* (1980) 106 Cal.App.3d 802, 805 [165 Cal.Rptr. 396], cited by seller, the issue does not concern a pure question of law and a noncurable defect of substance affecting the public interest and the administration of justice. ██ Rather, since it requires an equitable accounting, it involves factual as well as legal issues.[9]

## IV

### *Clerical Error*

██ Buyers ask us to correct a mathematical error in the judgment. The judgment orders buyers to deliver the $1,000 in escrow and pay seller by check $949,000, "said sum representing the total balance of the purchase price due." The mathematical calculations in the judgment, as seller admits in his opening brief, were "clearly erroneous." The trial court, in its ruling from the bench, explicitly found that the buyers' delay damages were $150,000. Moreover, the statement of decision and the judgment show on their face that the trial court expressly held that the purchase price for the property was $1,050,000, there was no premium payment due, and the buyers were entitled to a credit against the purchase price of $150,000 for delay damages. The check by buyers for the net purchase price should, therefore, be for $899,000.

██ It is well settled that clerical errors in a judgment, where they are shown by the record, may be corrected at any time. (*Dreyfuss* v. *Tompkins* (1885) 67 Cal. 339, 340 [7 P. 732].) A court of general jurisdiction has power after judgment, pending an appeal and even after affirmance of the judgment on appeal, and regardless of lapse of time, to correct clerical errors whether made by the court, clerk or counsel so that its records will conform to and speak the truth. (See 7 Witkin, Cal. Procedure, *supra*, Judgment, § 68, pp. 502-503.) And an appellate court may correct a judg-

[9]Thus, for example, in *Stratton* v. *Tejani, supra,* 139 Cal.App.3d 204, 213, the court pointed out that in determining the amount of seller's offset for lost use of purchase money "[t]he proper yield on these sums can best be determined by the trial court in an evidentiary hearing in which each party can present evidence" on various factors, such as the rate of interest paid by the sellers to maintain any trust deeds on the property during the delay period, the buyers' use of their retained purchase funds during this same period and the types of investments available to both parties for that period.

ment containing an obvious clerical error or other defect resulting from inadvertence by modifying the judgment. (See 9 Witkin, *supra,* Appeal, §§ 615-616, pp. 600-601.)

Seller is, of course, correct that "[a]n amendment that substantially modifies the original judgment . . . may not be made by the court under its authority to correct clerical error . . . unless the record clearly demonstrates that the error was not the result of the exercise of judicial discretion." (*In re Candelario* (1970) 3 Cal.3d 702, 705 [91 Cal.Rptr. 497, 477 P.2d 729].) ▆▆▆ This criterion, however, has been met. It is apparent from the record that a subtraction error was made which did not reflect the court's intent and express holdings.

Seller claims the judgment cannot be corrected because it is "invited error." But seller's reliance on *Tucker* v. *Cave Springs Min. Corp.* (1934) 139 Cal.App. 213, 218 [33 P.2d 871], *Kraus* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 374-375 [140 Cal.Rptr. 744], and *Smith* v. *Royal Mfg. Co.* (1960) 185 Cal.App.2d 315, 320 [8 Cal.Rptr. 417], is misplaced. The doctrine of invited error is not applicable here. Buyers did not propose a defective finding with respect to the amount of the purchase price or the amount of damages for delay. The factual findings set forth in the statement of decision, prepared and proposed by the buyers and adopted as correct and signed by the judge, expressly stated not only that the purchase price was $1,050,000 and the buyers' damages were $150,000 but also explained in detail how these figures were arrived at.

Although the buyers' attorney made a mistake in drafting the judgment and the trial court signed that judgment without correcting it, the error herein was inadvertent and therefore clerical. (See 7 Witkin, Cal. Procedure, *supra,* § 67, pp. 500-501.) A drafting mistake in the amount of the judgment is a common example of a clerical error which it is appropriate to correct. (*Id.,* § 69, p. 504.) If a trial judge through inadvertence or mistake signs an order different from that which he intended because of the error of an attorney draftsman, it may readily be corrected. (*Id.,* §§ 70-71, pp. 505-506.) "In these times busy judges must of necessity rely heavily upon the attorneys to prepare orders and judgments accurately so that they express that which was done at the trial and that which the judge had called for." (*Russell* v. *Superior Court* (1967) 252 Cal.App.2d 1, 8 [59 Cal.Rptr. 891].)

▆▆▆ ▆▆▆ Accordingly, we will modify the judgment to correct the clerical error herein so that the judgment will provide for buyers to deliver seller a check for $899,000, rather than $949,000.[10]

---

[10]We reject buyers' further request that we impose sanctions on the seller for a frivolous

*Disposition*

The judgment awarding plaintiff buyers specific performance is modified to provide that plaintiff buyers shall "pay to defendant [seller] the sum of $899,000 by bank check, said sum representing the total balance of the purchase price due to defendant from plaintiffs." As so modified, the judgment is affirmed. Each party shall bear his own costs.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 27, 1986.

---

appeal. Although we find the issues raised by seller on this appeal unmeritorious, they do not warrant sanctions under the standards set forth in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179]: "An appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions." (Italics in original.)