[Civ. No. 31213. Fourth Dist., Div. One. Feb. 21, 1985.]

ARCHITECTS & CONTRACTORS ESTIMATING SERVICE, INC.,
Plaintiff and Appellant, v.
HAROLD H. SMITH, JR., et al., Defendants and Respondents.

**COUNSEL**

Corona & O'Connor and J. Robert O'Connor III for Plaintiff and Appellant.

Gary S. Glauser for Defendants and Respondents.

**OPINION**

**BUTLER, J.**—Architects & Contractors Estimating Service, Inc., dba Charles Noble Company (Noble) appeals a judgment in favor of Harold H. Smith, Jr., dba Environmental Systems in a corporate and individual capacity (Smith), denying Noble damages for Smith's refusal to perform a subcontract. We shall hold Smith's consent to the contract was vitiated by his mistake of fact and Noble's fraud in intentionally concealing the cost of the subcontracted work and affirm.

I

On February 25, 1982, Noble contracted with the United States Navy to remodel the engine maintenance shop at El Toro Marine Corps Air Station. The contract price was some $647,500. The work included installation of heating, ventilating and air conditioning systems (HVAC). A chilled water system was part of the HVAC.

In preparing his bid for the work, Noble solicited "budgetary bids" from subcontractors. These bids are used as the basis for estimating the component parts of the work and as backup protection if other bids are not received. At the trial, Noble could not remember who submitted a budgetary bid for the HVAC. He used $90,000 to cover the HVAC cost in submitting to the Navy his successful $647,500 bid for the work. Bobbie Ruff, an estimator for American Standard Heating & Air Conditioning (American), testified his boss and president of American, John Paul Berry, directed him to prepare "some numbers" around $90,000 for Noble's use in submitting his bid to the Navy. He did so.

After he signed the contract with the Navy for the work, Noble submitted a formal bid for the HVAC to American. American bid in the HVAC at $86,500. Berry did not work on this bid for American. By that time he had quit American and was working for Smith. However, Berry called Ruff for the name of the suppliers Ruff had contacted in preparing the $90,000 estimate for Noble's use in bidding the Navy job and Ruff went to Berry's office to give him other information.

Earlier, Coast to Coast Sheet Metal (Coast), acting on its own initiative, had submitted a $94,000 bid to Noble for the HVAC exclusive of the chilled water system. Noble, however, sent on to Berry a contract for the HVAC work to be performed by American at its bid price of $86,500. Learning this, Coast warned Noble the $86,500 was not a reasonable bid as its $94,000 bid had excluded the chilled water system from the HVAC.

Four weeks later, Berry told Noble he would not sign the contract for "personal family reasons." He testified he had a number of questions and "I knew going in it was a low bid" and in hindsight, the work could not have been done as bid.

At this time, two of Smith's sons were working for Berry who suggested to Ruff the possibility Smith might do the work. This was after Noble asked Berry for suggestions for a subcontractor to take on the job. Smith listened to the proposition.

Berry told Smith his $86,500 bid had a 20 percent profit margin. Smith met with Noble, related Berry's assurance to him "there was a profit in it" and signed that same day a contract identical to that turned down by Berry. Smith told Noble at the time he had not done "much examination" of the plans or specifications and Ruff was going to look the job over. After checking the jobsite and the plans, Ruff told Smith the cost of the job "far exceeded" the contract price. The plans included the chilled water system in the HVAC which cost an additional $16,000 not contemplated by the contract. Smith promptly told Noble the $86,500 price would not cover the HVAC with the chilled water system. Noble responded with the comment he would get another contractor and "sue [Smith] for the difference."

Noble then turned back to Coast, awarding two subcontracts, one for $94,000 and one for $16,000 for the HVAC with the chilled water system and sued Smith for the difference between his bid and the combined Coast bids.

II

The trial commenced July 7, 1983, at 9:43 a.m. and concluded at 4:30 p.m., the court ruling from the bench in Smith's favor after hearing argument. Noble did not request a Code of Civil Procedure section 632[1] statement of decision before "submission of the matter for decision . . . ."

---

[1] "In superior, municipal, and justice courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. Upon the request of any party appearing at the trial, made within 10 days after the court announces a tentative decision, or if the trial has lasted less than one day, made prior to submission of the matter for decision, the court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial. The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision. After a party has requested such a statement, any party may make proposals as to the content of the statement of decision.

"The statement of decision shall be in writing, unless the parties appearing at trial agree otherwise; however, when the trial has been completed within one day, the statement of decision may be made orally on the record in the presence of the parties."

On July 12, 1983, Noble's lawyer sought an order excusing noncompliance with the requirement the request must be made before submission of the matter, pleading unawareness of that requirement. The motion was denied. A request for statement of decision, likewise filed July 12, 1983, was also denied.

Noble now contends the court should have permitted the request for statement of decision as the request was timely filed within 10 days following announcement by the court of its decision at the conclusion of the trial.

If the trial lasted "less than one day" section 632 requires the request be made prior to submission of the matter for decision. Noble claims a trial that commences at 9:15 a.m. [*sic*] and concludes at 4:30 p.m. the same day is not a trial that lasts "less than one day" and the ten days within which to submit a request is applicable.

The length of a day in court is measurable by the quiddities[2] of the judge presiding at the trial, the day of the week and if a golfer, his or her handicap, and availability of a congenial foursome. Some judges start early and leave late. Others come in late and leave early. We adopt a rule to fit all seasons and all sessions. A trial that is commenced and completed between the hours of 12:01 a.m. and 11:59 p.m. lasts less than one day.

### III

██ While claiming error, Noble does not specify the prejudice resulting to him from the claimed failure of the court to render a statement of decision. There was none. In announcing its decision from the bench, the court made clear the factual and legal bases for its ruling.

"It is my feeling that this contract entered was entered into with the mistake of fact—material state of fact to this case, and that the plaintiff in this case had the better opportunity to know of the mistake and he should have known. I think that he is in a better position to do that.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"I tend to agree that Mr. Smith, who was not particularly better in his business methods in obtaining perhaps—I don't know if it was desperation for lack of work or whatever other reasons he did not take the time that he

---

[2]"There's another. Why may not that be the skull of a lawyer? Where be his quiddities now, his quillets, his cases, his tenures, and his tricks?" (*Hamlet*, act V, scene 1.)

should have as a good businessman to examine the situation, but his mistake did not harm anything to Mr. Noble.

"Mr. Noble had already contracted with the Navy to provide the building and he had no subcontractor that could provide him at that price. He knew or should have known that there was a substantial error. The lowest bid that he had from somebody else of 94,000 did not include the chilled water system because an additional $16,000.00 approximately was for that.

"I think people with his background and experience and degree of expertise have an upper hand or a greater bargaining position, owe a duty to inquire as to when there is an obvious and material mistake in the contract, get some reassurance from those entering the contract that they're in fact not putting their heads—they're not going to lose everything, not only not make a profit, but suffer substantial losses."

IV

■ The court correctly applied the law and substantial evidence supports its factual conclusions.

■ It is essential to the existence of a contract that there be parties capable of contracting, their consent, a lawful object and consideration (Civ. Code,[3] § 1550). The consent of the parties to a contract must be free, mutual and communicated by each to the other (§ 1565). Consent is not free when obtained through fraud or mistake (§ 1567) and is deemed to have been so obtained when it would not have been given but for such fraud or mistake (§ 1568).

■ Mistake may be either of fact or law (§ 1576). A mistake of fact ". . . is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in:

"1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or,

"2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed." (§ 1577.) ■ A mistake need not be mutual. Unilateral mistake is ground for relief where the mistake is due to the fault of the other party

---

[3]All statutory references are to the Civil Code unless otherwise specified.

or the other party knows or has reason to know of the mistake. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 295, pp. 248-249.)

■ Here, substantial evidence supports the conclusion Noble knew Smith's contract for the HVAC did not include the chilled water system and Smith did not know his contract included the system.

To rely on a unilateral mistake of fact, Smith must demonstrate his mistake was not caused by his "neglect of a legal duty" (§ 1577). ■ Ordinary negligence does not constitute the neglect of a legal duty as that term is used in section 1577. (*Sun 'N Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671, 700-701 [148 Cal.Rptr. 329, 582 P.2d 920]; *White* v. *Berrenda Mesa Water Dist.* (1970) 7 Cal.App.3d 894, 901 [87 Cal.Rptr. 338].) ■ Here, Smith's business acumen was something less than sharp. This was his first venture into contract waters deeper than $10,000. Business was slow. He was ambitious. The HVAC work was an opportunity to move into heavy commercial air conditioning. He told Noble the plans and specifications had not been reviewed by him; Ruff was to undertake that task after the contract was signed. Importantly, Smith related to Noble the profit assurance given him by Berry. Noble did not disabuse him. In these circumstances, neither the trial court nor we could find Smith's conduct preposterous or irrational or constituting gross negligence and the neglect of a legal duty. (*Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588, 595 [297 P.2d 644].)

■ While the court relied on mistake to void the contract, we find an alternative ground sounding in fraud. Smith's consent was obtained by Noble's fraud in the suppression by Noble of the fact Berry's contract price for the HVAC did not include the cost of the chilled water system (§§ 1565, 1567). Noble's activities are "fitted to deceive" (§ 1572, subd. 5).

Noble's bid for the remodeling job included Ruff's $90,000 estimate for the HVAC as prompted by Berry. Noble caused Berry to reduce his formal bid for the HVAC to $86,500. Coast told Noble that bid was unrealistic; the chilled water system was an additional $16,000. Berry told Noble he would not do the work and suggested Smith as a replacement. Noble knew or should have known there was no profit in Berry's contract; indeed, it was clear the loss would be at least $16,000. He knew Smith undertook the work relying on Berry's profit assurance. He knew or should have known Smith was a babe in the woods of commercial air conditioning. Smith was set up by Noble. Noble's statement he would get another contractor to do the work and sue Smith for the difference is capped by his award of the

HVAC to Coast who early on had warned Berry's contract to which Smith succeeded was a loser.

Substantial evidence supports these conclusions. Noble wears the badge of fraud. His actions had a chilling effect on the deal.

Judgment affirmed.

Brown (Gerald), P. J., and Cowett, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.