[No. A040433. First Dist., Div. Two. Oct. 3, 1989.]

AUGUST J. BALISTRERI et al., Plaintiffs and Appellants, v. NEVADA LIVESTOCK PRODUCTION CREDIT ASSOCIATION et al., Defendants and Respondents.

**COUNSEL**

Nancy L. Case, Lawrence M. Einhorn and Beyers, Costin & Case for Plaintiffs and Appellants.

Roger J. Illsley, Anderson, McDonald, Belden & Kelly and Belden, Abbey, Weitzenberg & Kelly for Defendants and Respondents.

**OPINION**

**PETERSON, J.**—Appellants signed a deed of trust in favor of respondent, in order to help their son get a loan from respondent. Appellants believed that the deed of trust covered the house in Sebastopol which they owned together with their son, and where their son resided. Appellants' belief was consistent with the cover letter to the deed of trust which respondent sent to appellants, which described the deed of trust as covering "your Sebastopol

residence for your son . . . ." In fact the deed of trust described appellants' own residence in Petaluma as the real property which would become encumbered thereby. When respondent threatened to foreclose on appellants' home, appellants discovered the error; and they brought this action to quiet title and cancel the deed of trust based upon mistake of fact in its execution. The trial court found the facts as above stated; but the trial court concluded that relief was barred as a matter of law based upon the principle of neglect of legal duty, since appellants should have read the text of the deed of trust, not just the cover letter, and should have discovered the mistake in time. We reverse.

## I. FACTS AND PROCEDURAL HISTORY

Appellants' son sought crop financing from respondent in March 1983 for an alfalfa farm in Diamond Valley, Nevada. The proceeds of the first and second cuttings would serve to repay the loan. Respondent, based in Nevada, required security for the loan; but none of the commercial properties owned by appellants' son had sufficient equity. Respondent considered using as security the Sebastopol home[1] where appellants' son and daughter-in-law lived, and which was owned by appellants and their son; but respondent concluded that this was insufficient security because it was owned jointly by appellants and their son, and there were already too many loans in existence secured by that property.

At some point respondent and appellants' son discussed appellants' home in Petaluma also; and respondent's loan agent understood that there were two homes, one in Sebastopol owned by appellants and their son where the son resided, and one in Petaluma owned by appellants where they resided. However, respondent's loan agent also seems to have gotten the two homes confused. Respondent had access to title documents explicitly showing that appellants lived in and owned a house in Petaluma and also co-owned the house in Sebastopol; yet in internal documents to his loan board, respondent's loan agent identified the loan as being secured by the "father's residence in Sebastopol." He also prepared the deed of trust on appellants' home in Petaluma and gave it to appellants' son to have appellants execute.

Respondent's loan agent also prepared a cover letter to appellants which asked them to execute "a third Deed of Trust on your Sebastopol residence for your son . . . ," even though in fact the deed of trust was for

---

[1] We note from our examination of the record that in fact this home where appellants' son resided was not within the city limits of Sebastopol; but since the parties often refer to it as being the Sebastopol house, we will adopt their terminology for the sake of clarity.

appellants' own residence in Petaluma, not the one they co-owned with their son in Sebastopol.

Appellants saw the cover letter from respondent which referred to the Sebastopol residence and executed the deed of trust, thinking that it pertained to the Sebastopol home where their son lived and which they co-owned with him, not their own home in Petaluma. They would not have executed the deed of trust if they had known that it referred to their own home.

At the time respondent dealt with appellants' son, the Nevada property the latter was to farm as a tenant was already encumbered by indebtedness owed respondent; and respondent was anxious to see appellants' son or other successor farmer take over the payments, because its owners who had previously been loaned money by respondent were essentially bankrupt. Oddly enough, although respondent routinely requires a written appraisal of a property used as security, it obtained none on the Petaluma home until December of 1983, when the loan secured by the deed of trust thereon was already in default.

The farming venture in Nevada proved to be a failure, it seems, because the previous farmers had not planted enough alfalfa seeds, so the hay had too many weeds in it and was not really marketable as alfalfa. Appellants' son apparently sold the dry hay to dairies in California, but during the spring he did not remit any proceeds to respondent as he had agreed to do. When respondent contacted him, appellants' son would say that "the check is in the mail." After a month or so, respondent noticed that it never was. Respondent, however, took no steps to enforce its liens on the crop or proceeds, other than one contact with a farmer in Nevada. There was also evidence that appellants' son was somewhat less than forthright in his dealings with respondent; there was no evidence that appellants were involved in any of his alleged transgressions by way of ratification or otherwise.

That fall, with the loan in default, respondent wrote to appellants and contacted them by phone regarding the need to clear up the loan their son had taken out. Even at this point, respondent referred to the deed of trust appellants had signed as pledging "a third Deed of Trust on your Sebastopol residence for your son . . . ." It was apparently not until late that fall that appellants realized from a phone call from respondent that their own home in Petaluma, not their son's home in Sebastopol, was the one described by and subject to the lien of the deed of trust.

Appellants brought this action seeking to cancel the deed of trust. The evidence summarized above was adduced at a court trial. At its conclusion the trial court stated it believed appellants' testimony that they had not known they were signing a deed of trust for their own home as opposed to their son's home. However, the trial court ruled that because appellants had not read the text of the deed of trust, which amounted as a matter of law to neglect of legal duty, they could not prevail. The trial court concluded: "This is a painful decision. I can only have the greatest sympathy for the parents in here, but it's clear under the law that this court cannot grant relief in this situation."

Appellants timely appealed.

## II. DISCUSSION

■■■ We conclude appellants are legally entitled to relief in this situation because appellants and respondent made a mutual mistake of fact concerning the subject matter of the deed of trust. Respondent mistakenly believed appellants were granting a deed of trust on their own house in Petaluma. Appellants mistakenly believed, based upon respondent's representations in the cover letter to the deed of trust supported by respondent's subsequent communications, that they were granting a deed of trust on their son's house in Sebastopol which they co-owned. ■■■ Nor is appellants' claim for relief barred by their failure to discover in time that the deed of trust described the Petaluma house, not the Sebastopol house, because it was the respondent's cover letter which reasonably caused that failure to discover by leading appellants to mistakenly believe to the contrary. Due to mutual mistake as to the deed of trust's subject matter, no contract between appellants and respondent was formed; and the deed of trust should be cancelled.

### A. *Mistake*

The parties dispute here at some length their mutual ideas of the relevance of that famous old chestnut of a case dealing with a mutual mistake by the contracting parties, *Raffles* v. *Wichelhaus* (1864) 159 Eng.Rep. 375 (2 H. & C. 906), also known as the case of the Ship *Peerless*. It is fair to say this *Peerless* case has been more belabored than read. So there can be no mistake, we have peered into the dusty old English Reports again to learn the relevance of 19th century merchant practice to the difference between Sebastopol and Petaluma. In the *Peerless* case the parties contracted for "125 bales of Surat cotton, guaranteed middling fair merchant's Dhollorah" in the hold of the ship *Peerless,* then in Bombay harbor. (*Id.* at p. 375.)

However, the *Peerless* had a peer. Apparently unbeknownst to the contracting parties, there were in fact two ships of that name being loaded at piers in Bombay harbor; and the cryptic report of the case indicates the argument of counsel for the defendants was that, since each contracting party apparently believed the contract dealt with the goods aboard a different *Peerless,* there was no contract: "That being so, there was no consensus ad idem, and therefore no binding contract. . . . [¶] Per Curiam. [Pollock, C. B., Martin, B., and Pigott, B.] There must be judgment for the defendants." (159 Eng.Rep. at p. 376.) The court did not state the basis of its decision, although it appears to have summarily accepted defendant's argument that no contract results in these circumstances. One commentator has opined that this case "is to the ordinary run of case law as the recently popular theatre of the absurd is to the ordinary run of theatre. Appropriately enough, even the report of the case is weird." (Gilmore, The Death of Contract (1974) p. 35.)

However, California courts have cottoned to this case. (See, e.g., *French* v. *Construction Laborers Pension Trust* (1975) 44 Cal.App.3d 479, 488 [118 Cal.Rptr. 731] [" 'Thus, both parties may have a different understanding as to the *identity of the subject matter.* In the famous case of *Raffles* v. *Wichelhaus,* 2 H. & C. 906, there was an agreement to buy goods arriving on the ship "Peerless," and there were two steamers of that name, each party having in mind a different ship. No contract resulted.' " Quoting 1 Witkin, Summary of Cal. Law (now contained at (9th ed. 1987) Contracts, § 366, p. 333), italics added by Witkin.]; cf., *Barfield* v. *Price* (1871) 40 Cal. 535, 542 ["If plaintiff supposed she was selling a different tract of land, but the defendants thought they were purchasing the tract actually conveyed, there was a mutual mistake as to the subject matter of the contract. In that case the minds of the parties never met, and there was really no contract of sale at all. *The deed was made under a mutual mistake of both parties, each believing there was an agreement when there was none.*"; italics added.].)

Respondent suggests that appellants' reliance on the *Peerless* case misses the boat. In respondent's view, *Peerless* and its progeny are inapplicable because respondent "was not mistaken in its belief that the deed of trust encumbered the parents' residence in Petaluma, which was the security intended by [respondent]. Consequently, this could not be a mutual mistake case." Respondent is mistaken.

The problem here was that the "deed was made under a mutual mistake of both parties, each believing there was an agreement when there was none." (*Barfield* v. *Price, supra,* 40 Cal. at p. 542.) "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." (Civ.

Code, § 1580.) ▮ "If both parties are mistaken, and neither is at fault or both are equally to blame, the mistake may prevent formation of the contract." (1 Witkin, Summary of Cal. Law, Contracts, *supra,* p. 333.) "[I]n certain cases where there is a mutual misunderstanding regarding the identity of the subject matter of the contract, and either both parties are at fault in creating the mistake, or neither of the parties is at fault, there is no meeting of the minds as to a material matter, and no contract is formed. [Fn. omitted.]" (Miller & Starr, Cal. Real Estate (2d ed. 1989) Contract Law, § 1:94, p. 298; cf. *Kyle* v. *Kavanagh* (1869) 103 Mass. 356, 359-360 [parties contracted for the sale of a house on Prospect Street in Waltham, Massachusetts; but there were two Prospect Streets in Waltham, and by now the reader knows the rest of the story; "[I]f the defendant was negotiating for one thing and the plaintiff was selling another thing, and their minds did not agree as to the subject matter of the sale, there would be no contract by which the defendant would be bound, though there was no fraud on the part of the plaintiff. This ruling is in accordance with the elementary principles of the law of contracts, and was correct."].)

▮ Respondent however persists in arguing that this case cannot be analyzed as one of mutual mistake, and anchors its argument to the fact that respondent always wanted the deed of trust to pertain to the Petaluma property, and claims respondent was never mistaken about that. However, that does not mean there was no mutual mistake, since appellants always wanted the trust deed to pertain to the Sebastopol property. Here as in the *Peerless* and *Kyle* cases, each party knew what it wanted; but they did not want or assent to the same thing, and they were *both* mistaken about what the other party wanted; "their minds did not agree as to the subject matter." (*Kyle* v. *Kavanagh, supra,* 103 Mass. at p. 359.) "That being so, there was no consensus ad idem, and therefore no binding contract." (*Raffles* v. *Wichelhaus, supra,* 159 Eng.Rep. at p. 376.)

B. *Legal Duty*

▮ Respondent also argues that relief for appellants is barred because they were under a "legal duty" to read the deed of trust, not just respondent's cover letter which misled them; and appellants should have discovered the mistake. Respondent is at sea once again. We have no quarrel with the general proposition that a party is bound by a contract it executes, despite the claim that the party did not read the contract prior to signing. However, under the binding precedents by which we must navigate, that principle had no application here, because appellants reasonably relied upon mistaken representations by respondent concerning the subject matter of the contract.

The letter respondent sent to appellants was correctly addressed to their Petaluma home, and asked appellants to execute a deed of trust "on your Sebastopol residence for your son. . . ." Appellants did own together with their son, and respondent knew they owned, a Sebastopol residence where their son resided. No person receiving this letter would reasonably believe that the deed of trust referred to the Petaluma home to which the letter was correctly addressed, rather than the Sebastopol home which is explicitly identified in the cover letter as the subject property; and the trial court found as a fact that appellants only executed the deed of trust under the mistaken belief that it pertained to the Sebastopol property.

■ Where a party embarks upon a contract under the mistaken but reasonable belief, induced by action of the other party, that the subject matter of the contract is other than it in fact is, a claim for relief is not scuttled as a matter of law. "It is settled that, even in the absence of any misrepresentation, the negligent failure of a party to know or discover facts as to which both parties are under a mistake does not preclude rescission or reformation because of the mistake." (*Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588, 594 [297 P.2d 644].) In *Van Meter* the plaintiff entered into a contract to clear brush from real property which defendant informed him had been marked with flags by defendant. However, the written contract executed by the parties required plaintiff to clear a much larger area than that which had been so indicated. (*Id.* at pp. 591-592.) Defendant contended and the trial court agreed that relief was barred because the plaintiff should have read the contract, rather than relying on defendant's misleading statements.

Our Supreme Court reversed, because "it has been held that ordinary negligence does not constitute the neglect of a legal duty as that term is used in section 1577 of the Civil Code [citations]. [¶] There is even more reason for not barring a plaintiff from equitable relief where his negligence is due in part to his reliance in good faith upon the false representations of a defendant, although the statements were not made with intent to deceive. [Citations.] A defendant who misrepresents the facts and induces the plaintiff to rely on his statements should not be heard in an equitable action to assert that the reliance was negligent unless plaintiff's conduct, in the light of his intelligence and information, is preposterous or irrational. [Citation.] [¶] [W]e are of the opinion that any such determination could not be supported in view of the findings that were made." (46 Cal.2d at p. 595; see also *Waters* v. *Division of Labor Standards Enforcement* (1987) 192 Cal.App.3d 635, 641 [237 Cal.Rptr. 546] [relief granted in equity where "a plaintiff in good faith relies on the defendant's negligent misrepresentation" concerning the subject matter of the contract; citing *Van Meter* v. *Bent Construction*

*Co., supra,* 46 Cal.2d at p. 595.]; *Architects & Contractors Estimating Service, Inc.* v. *Smith* (1985) 164 Cal.App.3d 1001, 1008 [211 Cal.Rptr. 45] [relief granted in equity where party negligently signed contract under mistake of fact as to its subject matter: "Ordinary negligence does not constitute the neglect of a legal duty . . . . In these circumstances, neither the trial court nor we could find [respondent's] conduct preposterous or irrational or constituting gross negligence and the neglect of a legal duty."; citing *Van Meter* v. *Bent Construction Co., supra,* 46 Cal.2d at p. 595.].)

■ The same is true here. We would reach the same result even if we adopted respondent's suggestion and analyzed this case solely as one of unilateral mistake by appellants, since under the cases cited in this paragraph even a unilateral mistake, when induced by mistaken action of the other party, does not bar relief.

### C. *Attorney Fees*

■ Respondent was awarded its attorney fees by the trial court. With our reversal of the judgment, that award of fees is obviously also reversed.

■ Appellants also seek their attorney fees, because one covenant of the trust deed allows respondent to recover those fees; and pursuant to Civil Code section 1717, fees may therefore be awarded to the prevailing party, appellants. Respondent does not contend that appellants are mistaken here. Precedent dictates that such fees may be awarded even though we have found that in fact no valid contract existed, because the intent of Civil Code section 1717 is to afford "mutuality of remedy" under equitable principles; and a party may recover such fees by prevailing in an action which establishes that it is not bound by the contract in question, if that party would have had to pay the other's fees if it had lost. (*Reynolds Metals Co.* v. *Alperson* (1979) 25 Cal.3d 124, 128 [158 Cal.Rptr. 1, 599 P.2d 83]; accord *Wilhite* v. *Callihan* (1982) 135 Cal.App.3d 295, 301-302 [185 Cal.Rptr. 215].)

### III. DISPOSITION

The judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with the views expressed herein.

Benson, J., concurred.

SMITH, J.—I concur solely on the ground that the appellants' encumbrance of their Petaluma home was a unilateral mistake induced by the action of respondent. It was respondent Nevada Livestock Production

Credit Association's misleading statement contained in its cover letter to the deed of trust that led to appellants' mistaken execution of that document. (*Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588, 593-595 [297 P.2d 644]; *Architects & Contractors Estimating Service, Inc.* v. *Smith* (1985) 164 Cal.App.3d 1001, 1007-1008 [211 Cal.Rptr. 45]; cf. *Waters* v. *Division of Labor Standards Enforcement* (1987) 192 Cal.App.3d 635, 641 [237 Cal.Rptr. 546].)

A petition for a rehearing was denied Obtober 30, 1989.