ARMCO INC. and Armco Financial
Holding Corporation, Plaintiffs,

v.

GLENFED FINANCIAL
CORPORATION,
Defendant.

Civ. A. No. 87–5085.

United States District Court,
D. New Jersey.

Aug. 14, 1990.

Andrew T. Berry, Gita F. Rothschild, Lance D. Cassak, McCarter & English, Newark, N.J., for plaintiffs Armco, Inc. and Armco Financial Holding Corp.

Ronald M. Sturtz, Sheldon M. Finkelstein, Brad R. Roth, Hannoch Weisman, Roseland, N.J., for defendant Glenfed Financial Corp.

## OPINION

LECHNER, District Judge.

This protracted litigation arises from a series of agreements entered in or about April 1985 pursuant to which defendant Glenfed Financial Corporation ("Glenfed"), a subsidiary of Glendale Federal Savings and Loan Association ("Glendale"), acquired from plaintiff Armco Inc. ("Armco") the Armco Financial Corporation ("AFC"), a company engaged in the business of secured lending. The acquisition of AFC was completed by the merger of AFC and Glenfed pursuant to a document entitled the Agreement and Plan of Merger and Liquidation (the "Merger Agreement"). Glenfed App., Ex. 1.[1]

---

1. For purposes of this opinion, the documents submitted by the parties are identified as follows: Defendant's Memorandum in Support of Motion for Partial Summary Judgment (Reserve Issue), dated 9 February 1990 ("Glenfed Brief") and the Appendix thereto ("Glenfed App."); Brief in Support of the Cross–Motion for Partial Summary Judgment in Opposition to Defendant's Motion for Partial Summary Judgment (Reserves Issue), dated March 1990 ("Armco Brief"); Defendant's Reply Memorandum in Support of Motion for Partial Summary Judg-

The action encompasses a number of discrete controversies, three of which have been addressed on motions for partial summary judgment in a Letter–Opinion and Order dated 8 August 1989. *See Armco Inc. v. Glenfed Financial Corp.*, 720 F.Supp. 1129 (D.N.J.1989) ("*Armco I*").[2] The opinion in *Armco I* granted partial summary judgment in favor of Glenfed on the issue involving the Merger Agreement's "realized tax benefits" clause and directed an evidentiary hearing to resolve two issues involving the "Aircraft Agreement" entered into by the parties in connection with the acquisition of AFC. *Id.* at 1131.

Presently before the court are the cross-motions of Glenfed and Armco for partial summary judgment on what is designated the "Reserve Issue." The Reserve Issue relates to paragraph 24(b) of the Complaint in which Armco alleges Glenfed breached the Merger Agreement by asserting claims for indemnification in excess of $20 million including "overstating credit losses by failing to account for the specific and general reserves set forth in the [Balance Sheet[3]]." Complaint, ¶ 24(b). For the reasons stated below, partial summary judgment on the Reserve Issue is granted in favor of Armco.

## I. *Legal Principles*

Summary judgment should be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. The parties are well acquainted with the summary judgment standard. *Armco I*, 720 F.Supp. at 1131–32.

The appropriateness of granting summary judgment in favor of either party depends upon whether the Reserve Issue is a question of contract construction or contract interpretation.

The construction of an unambiguous term in a contract is "exclusively within the court." *Gray v. Joseph J. Brunetti Constr. Co.*, 266 F.2d 809, 893 (3d Cir.), *cert. denied*, 361 U.S. 826, 80 S.Ct. 74, 4 L.Ed.2d 69 (1959). *Accord Ram Constr. Co. v. American States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir.1984) ("When the question is one of 'construction' as distinguished from 'interpretation' of the contract, the issue is one of law."). Construction of a contract is defined as the process by which a contract is given a legal effect. *Ram Constr.*, 749 F.2d at 1053. As such, the construction of a contract's terms are [sic] a question of law.

The question whether a term is clear or ambiguous is also a question of law. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 362 (3d Cir.1987); *Kroblin Refrigerated XPress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986). Ambiguity exists if the terms of the contract are susceptible to two reasonably alternative interpretations. *Mellon Bank v. Aetna Business Credit*, 619 F.2d 1001, 1011 (3d Cir.1980). The interpretation of ambiguous terms in a contract is generally a question of fact. *Ram Constr.*, 749 F.2d at 1052.

*Nevets C.M., Inc. v. Nissho Iwai American Corp.*, 726 F.Supp. 525, 531 (D.N.J.1989), *aff'd mem.*, 899 F.2d 1218 (3d Cir.1990). *Accord IBEW, Local 47 v. Southern California Edison Co.*, 880 F.2d 104, 107 (9th Cir.1989); *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir. 1979), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1980); *Apra v. Aureguy*, 55 Cal.2d 827, 13 Cal.Rptr. 177, 178, 361 P.2d 897, 898 (1961).[4]

---

ment (Reserve Issue) and Memorandum in Opposition to Plaintiff's Cross–Motion for Partial Summary Judgment (Reserve Issue), dated 16 April 1990 ("Glenfed Reply"); Affidavit of Lance D. Cassak, filed 16 April 1990 ("Cassak Aff.").

**2.** Because this opinion addresses only a portion of this protracted controversy, it should be read in conjunction with *Armco I.*

**3.** For purposes of this opinion, the term "Balance Sheet" refers to the Consolidated Financial Statements of AFC for the years ending 31 December 1983 and 1984. Glenfed App., Ex. 2.

**4.** As noted in the previous opinion in this case, California law is controlling. *Armco I*, 720 F.Supp. at 1132. The parties, however, rely on New Jersey and California law in discussing principles of contract construction. Glenfed Brief at 16; Armco Brief at 21. Because the

■ If the Reserve Issue may be decided as a matter of law, the principles of contract construction, rather than interpretation, will dictate the outcome. Where possible, a contract must be construed as a whole and in a manner which does not render performance impossible. *Brobeck, Phleger & Harrison*, 602 F.2d at 872. In *Armco I*, it was noted the court "will not step in and rewrite the Merger Agreement in order for [a party's] position to prevail. .... The patent terms of the Merger Agreement will be given effect." 720 F.Supp. at 1138.

The *Armco I* opinion continued:

This result obtains from the so-called "objective theory of contract," under which the subjective, undeclared, intentions of the parties are immaterial, because manifestation of intention (as reflected in the language) controls. *See, e.g., Heston v. Farmers Insurance Group*, 160 Cal.App.3d 402, 206 Cal.Rptr. 585 (1984).

In construing a contract which purports on its face to be a complete expression of entire agreement between the parties, courts will not add another item on which the agreement is silent. *Wm. E. Doud & Co. v. Smith*, 256 Cal.App.2d 552, 64 Cal.Rptr. 222 (Cal.Ct.App.1967). The undisclosed intentions of parties to a contract are not material. *Id.* 64 Cal. Rptr. at 226. *See also Rosen v. E.C. Losch, Co.*, 234 Cal.App.2d 324, 44 Cal. Rptr. 377 (Cal.Ct.App.1965) (court is without power, under guise of contruction [sic], to depart from plain meaning of words contained in writing and insert terms or limitations not found therein). In arriving at the intentions of the parties to a written contract, courts cannot be guided by an unexpressed state of mind. *Crow v. P.E.G. Construction Co.*, 156 Cal.App.2d 271, 319 P.2d 47 (Cal.Ct. App.1957) (when language of contract is plain and unambiguous it is not within province of court to rewrite or alter by construction what has been agreed upon).

*Id.* These principles apply with equal force to the motions *sub judice*.

■ To determine the meaning of the terms of an agreement by the objective manifestations of the parties' intent, the terms of the contract must be given their "plain and ordinary meaning." *Nevets C.M., Inc.*, 726 F.Supp. at 533. "Certain terms, however, will be considered in the context in which the agreement was drafted:

Trade terms, legal terms of art, numbers, common words of accepted usage and terms of a singular nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent."

*Id.* (quoting *Mellon Bank v. Aetna Business Credit*, 619 F.2d 1001, 1013 (3d Cir. 1980)). *Cf. Armco I*, 720 F.Supp. at 1140 n. 22 (declining to define the term "realized tax benefits" according to the meaning of the term used in the tax laws because such a definition would lead to a result not within the terms of the agreement).

In addition, the Third Circuit has emphasized the importance of analyzing the specific terms of a contract with regard to the meaning of the contract as a whole:

Because other terms of the same agreement are among the most objective indications of the parties' intentions with regard to the missing term, it was not only proper but absolutely necessary for the district court to look to the whole agreement. "A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together." Restatement (Second) of Contracts § 202(2) (1981). A corollary to the principle is that an ambiguous subsidiary contractual provision must be given an interpretation consistent with the dominant purpose of the contract.

*Basco Urban Renewal Corp. v. Housing Auth. of the City of Atlantic City*, 674 F.2d 1001, 1009 (3d Cir.1982) (New Jersey law). *Accord Brobeck, Phleger & Harri-*

common law principles of contract construction appear to be substantially the same in California and New Jersey, reference to the law of New Jersey and the Third Circuit is appropriate.

son, 602 F.2d at 872; *Nish Noroian Farms v. Agricultural Lab. Rel. Board*, 35 Cal.3d 726, 735, 201 Cal.Rptr. 1, 5–6, 677 P.2d 1170, 1174–76 (1984).

It is also important to note the role of common sense in the construction of contracts:

> The construction of a written instrument "to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical [people] to accomplish an honest and straightforward end."

*Krosnowski v. Krosnowski*, 22 N.J. 376, 387, 126 A.2d 182 (1956) (quoting *Clark v. State St. Trust Co.*, 270 Mass. 140, 169 N.E. 897 (1930)). Mindful of these general principles, the discussion turns to the Reserve Issue.

## II.  *Facts*

The structure of the merger and acquisition of AFC is discussed in *Armco I*, 720 F.Supp. at 1131. Because this was a complex transaction involving numerous agreements, only those portions of the Merger Agreement relevant to the Reserve Issue are discussed here.

### A.  The Purchase Price

On 10 April 1985, Armco, Glendale and their subsidiaries entered into the Merger Agreement. Under the terms of the Merger Agreement, Glendale acquired the stock and assets of AFC, merging it into Glendale's newly created subsidiary, Glenfed. *Armco I*, 720 F.Supp. at 1131.

The acquisition purchase price, set forth in section 2.5 of the Merger Agreement, contained two components. First, Glendale paid to Armco a "Cash Purchase Price" equal to the net book value of the assets of AFC, as adjusted by several credits and debits, less the sum of $20 million. Merger Agreement, § 2.5(a). Second, Glendale executed and delivered to Armco a subordinated promissory note (the "Note") in the principal amount of $20 million bearing an annual interest rate of 12% and maturing in two years from the date of closing. *Id.* § 2.5(b).

The principal amount of the Note was subject to an indemnification formula in section 6.2 of the Merger Agreement:

> Armco agrees to indemnify and hold Glendale and [Glenfed] harmless against any loss, damage, or expense (including reasonable attorneys' fees) suffered by Glendale or [Glenfed] in connection with:
>
> .          .          .          .          .
>
> (e) *all Credit Losses to the extent that the aggregate thereof exceeds Five Million Dollars ($5,000,000).* Any payment by Armco hereunder or any reduction of the principal amount of the [Note] shall be deemed to be an adjustment in the purchase price.

*Id.* § 6.2 (emphasis added).

The indemnification provision was subject to section 6.7(d) of the Merger Agreement which provided:

> To the extent that any indemnification shall be payable pursuant to Section 6.2(e), such payment shall be made, and shall only be made, by the reduction, on a dollar-for-dollar basis, in the principal amount of the [Note].

*Id.* § 6.7.

### B.  Credit Losses

For purposes of determining the amount of Armco's indemnification to Glenfed pursuant to section 6.2(e), the term "Credit Losses" is defined in section 1.17 of the Merger Agreement:

> The term "Credit Loss" means and refers to ... the portion of any Loan Account, as in effect on the Closing Date [as adjusted by certain credits and debits] as to which portion [Glenfed] shall have pursued collection in accordance with industry practices and which shall in good faith have been determined to be uncollectible [as adjusted by certain additional credits and debits].
>
> Notwithstanding anything to the contrary in this Section 1.17, in no event shall a Credit Loss for any Loan Account exceed the amount of such Loan Account on the Closing Date.

*Id.*, § 1.17. As discussed more fully below, Glenfed places emphasis on the fact that section 1.17 speaks of a "Credit Loss" in the singular form as opposed to the plural term "Credit Losses" which is used in section 6.2(e).

The definition of Credit Loss of section 1.17 uses the term "Loan Account," which is defined in section 1.26 of the Merger Agreement:

> The term "Loan Account" means and refers to the "Finance Receivables" as included in the [Balance Sheet], plus [Glenfed's] out-of-pocket costs and expenses reasonably incurred in the collection thereof, less "Receivable from aircraft sales-net" and "Residual value of leased equipment" which are referred to on such Balance Sheet.

*Id.* § 1.26.

On the Balance Sheet, "Financial Receivables" is one of six general categories of assets. Deducted from Financial Receivables is an item termed "Allowance for Credit Losses." The parties agree this item is merely another term for reserves. Glenfed Brief at 9; Armco Brief at 8. The listing of assets on the Balance Sheet is in the form and is stated as follows, in thousands:

| ASSETS | 1984 | 1983 |
|---|---|---|
| Cash and short-term marketable securities | $ 9,328 | $ 17,672 |
| Finance receivables: (note 3) | | |
|     Industrial term loans | 210,603 | 157,394 |
|     Assigned receivables, rediscount, and inventory loans | 136,759 | 84,979 |
|     Leases | 23,211 | 34,996 |
|     Receivable from aircraft sale-net | 11,884 | 37,418 |
|     Non-earning receivables | 14,825 | 43,128 |
|     Investment in joint ventures | 8, 176 | 10,124 |
|     Residual value of leased equipment | 5,219 | 8,005 |
|     Unearned income | (7,295) | (9,631) |
| | 403,382 | 366,413 |
| Allowance for credit losses | (11,222) | (11,252) |
| | 392,160 | 355,161 |
| Assets held for resale | 9,172 | 2,642 |
| Due from affiliated companies | 40,419 | 50,615 |
| Goodwill-net of accumulated amortization of $256 in 1984 and $175 in 1983 | 2,971 | 3,051 |
| Other assets | 2,560 | 2,423 |
|     Total | $456,610 | $431,564 |

Glenfed App., Ex. 2.

---

Note 3 of the Balance Sheet sets forth the percentage of the portfolio of contractual Finance Receivables which were scheduled to mature each year from 1985 through 1990. *Id.* (Balance Sheet, Note 3 at 3). Important to Glenfed's interpretation of the Merger Agreement are the facts that 61% of contractual Finance Receivables were to mature in the first two years after the merger of AFC and Glenfed (*id.*) and that Armco retained $2.5 million of the $11.2 million in reserves on the Balance Sheet under the terms of the Merger Agreement. Glenfed Reply Brief, Ex. 1.

### III. *Discussion*

#### A. ·The Reserve Issue

The Reserve Issue concerns the proper amount of Credit Losses to be deducted from the principal amount of the Note pursuant to section 6.2(e) of the Merger Agreement. The Reserve Issue pivots on the meaning of Credit Losses, as demonstrated by the objective manifestation of the par-

ties' intent in the terms of the Merger Agreement.

Section 1.17 defines a Credit Loss as the uncollectible "portion of any Loan Account, as in effect on the Closing Date," as adjusted by certain credits and debits. *Id.* § 1.17. As noted by Armco, the assets of AFC were valued on a net book value basis as of the Closing Date. Section 1.26 in turn defines a Loan Account as "the 'Finance Receivables' as included in the [Balance Sheet], plus [certain expenses], less 'Receivable from aircraft sales-net' and 'Residual value of leased equipment' which are referred to on such Balance Sheet." *Id.* § 1.26. The linchpin in the Reserve Issue is whether the calculation of the amount of a Loan Account for purposes of Armco's indemnification includes a deduction for the Allowance for Credit Losses from Finance Receivables, as shown on the Balance Sheet.

### B.  Appropriateness of Summary Judgment

When this motion was filed, the parties stipulated and represented that the Reserve Issue could and should be resolved by looking to the four corners of the Merger Agreement without resort to extrinsic evidence or an evidentiary hearing. Glenfed Brief at 2; Armco Brief at 1. In its moving papers Glenfed repeatedly asserted that the Reserve Issue was ripe for review on a motion for summary judgment.[5]

At oral argument on these motions, counsel for both parties were asked whether they agreed the Reserve Issue could be decided as a matter of law. They answered in the affirmative.[6]

The parties have limited their discovery concerning the Reserve Issue to facilitate the decision of this motion on the basis of the record presented to the court. Tr. at 5, 14; Berry Letter at 3 n. 2. If the record were opened to accept extrinsic evidence, a decision on the Reserve Issue would necessarily be delayed to provide time for the parties to collect evidence and to prepare their respective cases in a manner different from that which they both followed in reliance upon the stipulation that the Reserve Issue would be decided on the terms of the Merger Agreement alone.

**5.** The repeated assertions of Glenfed include the following: Glenfed Brief at 2 ("The reserve issue can be straightforwardly resolved by looking to the four corners of the Merger Agreement"); *id.* at 15–16 ("Plaintiffs should not be permitted to introduce any testimony—assuming they have any to introduce—to the effect that a different arrangement was intended"); *id.* at 16 ("The issue is ripe for summary judgment, and requires no evidentiary hearing."); *id.* at 19 ("With respect to the reserve issue, there can be no genuine dispute of fact"); Glenfed Reply at 14–15 ("Given the unambiguous language of the Merger Agreement, this Court need not, and should not, undertake an inquiry into the unexpressed intention or state of mind lying behind that language"); *id.* at 15 ("The Agreement's purchase price formula is an unambiguous integration of the parties' intentions and should be enforced").

Armco also represented the Reserve Issue should be decided as a matter of law, as follows: On this much the parties agree: the issue of whether Glenfed has improperly overstated the amount of credit losses by failing to account for specific and general reserves is answered within the four corners of the Merger Agreement, including the documents referred to therein. This issue is ripe for summary judgment and Armco therefore submits this cross-motion for summary judgment.

Armco Brief at 1.

**6.** The colloquy with counsel proceeded as follows:

> THE COURT: ... I want to get a statement from each of you and I want to use it to pin you both down. I don't want to see this on appeal. That's why I'm going to ask you.
>
> Are you both telling me that in light of my comments to you, you want me to stick to this agreement, the four corners of this agreement and make the call?
>
> .     .     .     .     .
>
> MR. BERRY [counsel for Armco]: The answer is I think this is a summary judgment case. I don't think there is [sic] disputed issues of material fact. Neither party has suggested that there are.
>
> THE COURT: Fine. Mr. Sturtz, are you in agreement?
>
> MR. STURTZ [counsel for Glenfed]: As long as I win.
>
> .     .     .     .     .
>
> THE COURT: No, are we in or out? Is this a summary judgment motion or is it not?
>
> MR. STURTZ: On the defendant's side it is a summary judgment motion.

Transcript of Proceedings, dated 18 June 1990 ("Tr.") at 16–17.

Despite the express stipulations and representations that this motion should be decided without going beyond the four corners of the Merger Agreement, counsel for Glenfed, after oral argument, submitted a letter "to expand the record for consideration" on the Reserve Issue. *See* Letter, dated 25 June 1990, from Ronald M. Sturtz, Esq., to chambers (the "Sturtz Letter"). The Sturtz Letter urged the acceptance and consideration of the Certification of Keith Russell, Esq. (the "Russell Certification"), the individual whom Glenfed contends had primary responsibility for negotiating the Merger Agreement on its behalf.

The Russell Certification supports Glenfed's argument that the $5 million threshold for Armco's indemnification of Glenfed's Credit Losses was intended to be an estimate of the amount of reserves for which Glenfed had received a benefit in calculating the Cash Purchase Price. *See infra* Part E. The Russell Certification was prepared after oral argument on the Reserve Issue as the result of an informal discussion between Messrs. Sturtz and Russell in the courthouse. Sturtz Letter at 5–6.

In opposition to the Sturtz Letter, Armco submitted a Letter, dated 27 June 1990, from Andrew T. Berry, Esq., to chambers (the "Berry Letter"), in which Armco contended that the Russell Certification was inadmissible under the parol evidence rule and that Glenfed is judicially estopped from attempting to raise a genuine issue of material fact on the Reserve Issue. Berry Letter at 1. The Berry Letter generated a reply letter from Glenfed and a sur-reply letter from Armco.[7] Armco has not attempted to submit extrinsic evidence in contradiction to the Russell Certification.

### 1. *Parol Evidence Rule*

Armco argues the Russell Certification is inadmissible because the Merger Agreement represents a final integration of the agreement between the parties. Section 9.2 of the Merger Agreement states: "This Agreement ... constitutes the complete agreement of the parties and terminates

and supersedes any and all prior agreements...." *Id.* Armco argues this merger clause renders the Russell Certification inadmissible under the parol evidence rule because the Russell Certification is evidence of Glenfed's subjective understanding of the Reserve Issue which, if accepted, would vary or contradict the terms of the Merger Agreement. *Barris Indust., Inc. v. Worldwide Enterprises, Inc.*, 875 F.2d 1446, 1450 (9th Cir.1989); *A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc.*, 852 F.2d 493, 495 (9th Cir.1988); *Hennefer v. Butcher*, 182 Cal.App.3d 492, 501, 227 Cal.Rptr. 318, 322 (1986) (review denied 27 Aug. 1986).

▬ Although the Merger Agreement may be a fully integrated writing, extrinsic evidence such as the Russell Certification may be admissible if it supports an interpretation to which the terms of the contract are reasonably susceptible.

> Under California law, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the contract is reasonably susceptible."

*Barris Indust., Inc.*, 875 F.2d at 1450 (quoting *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 442 P.2d 641, 644, 69 Cal.Rptr. 561, 564 (1968)). Even if the contract appears to be unambiguous on its face, extrinsic evidence may be admitted to determine whether an ambiguity exists. *Id.* Extrinsic evidence is not admissible to advance an interpretation to which the language of the contract is not reasonably susceptible. *Id.; A. Kemp Fisheries, Inc.*, 852 F.2d at 496.

▬ Were the Russell Certification accepted, it would not alter the outcome of the decision on the Reserve Issue. As discussed more fully below, the argument advanced in the Russell Certification is the same as the argument of Glenfed at·oral

---

7. *See* Letter, dated 29 June 1990, from Ronald M. Sturtz, Esq., to chambers; Letter, dated 29 June 1990, from Andrew T. Berry, Esq., to chambers.

argument and in its briefs. Although consistent from Glenfed's subjective point of view, this argument is simply not sufficient to outweigh the objective meaning of the term Credit Losses, as disclosed by the terms of the Merger Agreement. *See infra* Part D. In California, while extrinsic evidence may be admitted to determine whether ambiguity exists, "the mere existence of extrinsic evidence supporting an alternative meaning does not foreclose summary judgment where the extrinsic evidence is insufficient to render the contract susceptible to the nonmovant's proffered interpretation." *Barris Indust., Inc.*, 875 F.2d at 1450. Therefore, submission of the Russell Certification does not *per se* foreclose summary judgment.

### 2. *Judicial Estoppel*

■ The late submission of the Russell Certification is an attempt by Glenfed to reverse its position that the Reserve Issue should be decided as a matter of law based on the terms of the Merger Agreement alone. The submission of the Russell Certification is also a reversal of the position that extrinsic evidence need not be admitted to construe the terms of the Merger Agreement. The Sturtz Letter and subsequent submissions of Glenfed refuse to concede straightforwardly the change in position.

Counsel for Glenfed argues the filing of a motion for summary judgment is not a concession that no genuine issue of material fact exists, but only that no such issue exists as long as the moving party's position is adopted. *U.S. Trotting Ass'n v. Chicago Downs Ass'n*, 665 F.2d 781, 785 (7th Cir.1981); *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 325 (10th Cir. 1967). There is no reason to take issue with this assertion. Even where the court is faced with cross-motions for summary judgment in which both parties assert the absence of a genuine issue of material fact, the court may take a contrary position and deny both motions in favor of an evidentiary hearing. This was the outcome of the deferred income issue in *Armco I*, 720 F.Supp. at 1152, 1156.

The procedural posture of the Reserve Issue, however, is significantly different from that of the motions in *Armco I* or indeed from authority cited by Glenfed and mentioned in the above paragraph. The Reserve Issue was brought before the court on the motion of Glenfed with the express stipulation and representation that the terms of the Merger Agreement should be given meaning without resort to extrinsic evidence. Armco responded by cross-moving for summary judgment on the Reserve Issue and stating that the parties agreed there were no material facts in dispute. The positions of the parties were explicitly reaffirmed at oral argument upon direct questioning.

The stipulations and representations of the parties constituted a binding judicial estoppel of their positions on the Reserve Issue. The Third Circuit has recognized repeatedly the principle of judicial estoppel: "a party who has gained an advantage by characterizing the *law or facts* involved in a case should not later be able to contradict that characterization to obtain a further advantage." *United States v. Kepner*, 843 F.2d 755, 760 (3d Cir.1988) (emphasis added). *See also Delgrosso v. Spang & Co.*, 903 F.2d 234, 241 (3d Cir.1990); *Lewandowski v. National Ry. Passenger Corp. (Amtrack)*, 882 F.2d 815, 818 (3d Cir.1989); *Murray v. Silberstein*, 882 F.2d 61, 66 (3d Cir.1989).

Judicial estoppel is usually applied where the party changing its position benefitted from the assertion of its prior contradictory position. Such a change in position "would most flagrantly exemplify playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate." *Scarano v. Central Ry. Co.*, 203 F.2d 510, 513 (3d Cir.1953) (quoted in *Delgrosso*, 903 F.2d at 241; *Lewandowski*, 882 F.2d at 819; *Murray*, 882 F.2d at 66).

In this case, Glenfed benefitted from its prior assertions that there was no need for the submission of extrinsic evidence on the Reserve Issue. Armco did not, and to date has not, made an attempt to complete discovery in support of its position. The Russell Certification was prepared and sub-

mitted following oral argument on the Reserve Issue. Had the court ruled from the bench and not reserved decision on these cross-motions, there may have been no opportunity or chance for Glenfed to reverse its continual insistence that the Reserve Issue be decided on the basis of the Merger Agreement alone.[8]

This is not simply a matter of deciding when to close the record on a summary judgment motion. Counsel for both parties have been given great leeway to structure in a thorough and professional manner the presentation of the discrete issues which comprise this controversy. The record on this motion was never open to the submission of evidence beyond the Merger Agreement. This posture was based upon the parties' express stipulations and representations that there was no need for such evidence. In a complex litigation such as this, the stipulations and representations of counsel must be accepted and relied upon in order to accomplish an orderly adjudication of the case.

It is clear from the submission of the Russell Certification that Glenfed has attempted to renege on its stipulation and representation that the Reserve Issue should be decided as a matter of law. It is also clear Glenfed is playing "fast and loose" with the serious concerns regarding the procedural posture of this motion which were voiced at oral argument. Therefore, the Russell Certification will not be considered and the Reserve Issue is decided as a matter of law based upon the plain and ordinary meaning of the terms of the Merger Agreement.

## C. The Positions of the Parties

### 1. Glenfed's Argument

Glenfed's position on the Reserve Issue may be summarized simply: section 6.2 of the Merger Agreement calls for deduction of "all Credit Losses" in excess of $5 million from the principal amount of the Note,

no more or less. The definition of "a Credit Loss" under section 1.17, according to Glenfed, does not include a deduction for applicable reserves. In fact, Glenfed argues that nowhere in the Merger Agreement is the purchase price adjusted by the amount of AFC's reserves, nor are such reserves even mentioned in the Merger Agreement. Glenfed Brief at 5.

As to the inclusion of the Allowance for Credit Losses in the list of Finance Receivables on the Balance Sheet, Glenfed argues the natural reading of section 1.26 is that a Loan Account refers to a single "unit" of Finance Receivables. Glenfed Brief at 9. Glenfed reads the definition of a Loan Account as referring exclusively, rather than inclusively, to the categories of Finance Receivables. Placing particular emphasis on the fact that the definitions of "Credit Loss" (§ 1.17) and "Loan Account" (§ 1.26) refer to a singular item rather than plural items, Glenfed claims the reference to "Finance Receivables" in section 1.26 is a reference to single units. Thus, Glenfed concludes nothing in sections 1.17 or 1.26 indicates the definition of a Loan Account was intended to require a Credit Loss to be an amount equal to the total Finance Receivables less all or some portion of the reserves as expressed on the Balance Sheet.

### 2. Armco's Argument

Armco, on the other hand, urges an inclusive reading of the definition of a Loan Account. Armco maintains that the Allowance for Credit Losses is expressly included as part of Finance Receivables on the Balance Sheet and therefore should be included in the amount of Credit Losses under the Merger Agreement. Armco points to the fact that the reserves were used to calculate the net book value of AFC and the ultimate Cash Purchase Price paid by Glenfed to Armco for AFC. Therefore, Armco argues, the reserves must be con-

---

8. Glenfed, however, could have made a motion for reconsideration of the Reserve Issue and the matter would be in a similar procedural posture. However, a motion for reconsideration pursuant to Fed.R.Civ.P. 60(b)(2) must be based upon "newly discovered evidence which by due

diligence could not have been discovered in time...." *Id.* It is doubtful that the data in the Russell Certification could not have been discovered in the exercise of reasonable diligence prior to oral argument on the Reserve Issue.

sidered in calculating the amount of Credit Losses incurred by Glenfed.

In opposition to Glenfed's assertion that a Loan Account is a single unit of Financial Receivables, Armco contends an exclusive reading of the definition of a Loan Account does not preclude reading the Allowance for Credit Losses as a single unit of Finance Receivables. By this logic, according to Armco, the Allowance for Credit Losses, which is included in the calculation of Financial Receivables on the Balance Sheet, may be considered a single unit just as any other category of Finance Receivables. Armco Brief at 15–16.

D. Plain and Ordinary Meaning of "Credit Losses"

■ Glenfed contends a Loan Account refers to a single unit of Finance Receivables, except for the units termed "Receivable from aircraft sale-net" and "Residual value of leased equipment." Merger Agreement, § 1.26. Under this view, the Allowance for Credit Losses plays no part in the definition of a Loan Account.

Glenfed supports its argument with inferences drawn from the expression of the definitions of Credit Loss and Loan Account in terms of single units. Glenfed claims the term "all Credit Losses" in section 6.2(e) refers to the aggregate of each individual Credit Loss, which in turn is the entire uncollectible portion of "any Loan Account." *Id.* § 1.17. Glenfed argues the term Loan Account cannot refer to the aggregate of Finance Receivables less credit loss reserves because this "would imply that the entire portfolio consisted of one Loan Account totalling some $400 million." Glenfed Reply at 6.

This position is supported by the concession of Armco that: "The majority of the reserves were *specifically* calculated for *separate* loan accounts, based on an *individual* assessment of a variety of known factors applicable to that *particular* account." Armco Brief at 25 (emphasis added). Because the Balance Sheet contains an aggregate of individual accounts, each of which was subject to an individual reserve valuation, the subtraction of the total of all credit loss reserves from the amount of the indemnity would be inconsistent with the way in which those reserves were calculated.

The problem with Glenfed's interpretation, however, is that the definition of a Loan Account refers to "Finance Receivables" in the plural form. The Balance Sheet, which is explicitly incorporated into the Merger Agreement by reference, includes the Allowance for Credit Losses among the entries which comprise the category of assets named Finance Receivables. As Armco contends, the natural reading of Finance Receivables as listed on the Balance Sheet includes the deduction for reserves. Tr. 12–13.

If, as Glenfed suggests, the drafters of the Merger Agreement intended "Credit Losses" to refer only to individual units of Finance Receivables, they could and *should* have so provided. The plain and ordinary reading of Finance Receivables is as a reference to an aggregate figure, not individual units, despite the inferences drawn by Glenfed from other portions of the Merger Agreement.

The Merger Agreement could have referred to a Loan Account as "any asset" constituting a Finance Receivable "except" the two specifically excepted categories of assets. Section 1.26, however, refers to Finance Receivables "less" the two categories. The natural interpretation of the term "less" rather than the term "except" favors an inclusive rather than exclusive reading of section 1.26. If the drafters intended the term Finance Receivables to exclude the Allowance for Credit Losses, they could and should have done so expressly by including the reserves among the list of two Finance Receivable assets that are excluded from section 1.26.

Armco's argument is also consistent with the accepted method of reading balance sheets and financial statements. On the Balance Sheet, both the individual assets and the reserves are included under the heading "Finance Receivables." The reference materials on which Armco relies are instructive:

The classification in financial statements should be designed primarily to facilitate the needs of readers. Related items should be grouped and valuation accounts added or deducted directly from the items which they modify.

S. Davison & R. Weil, The Handbook of Modern Accounting 2–6 (1977) (Cassak Aff., Ex. E) (quoted in Armco Brief at 14–15); *see also* R. Kay & D. Searfoss, Handbook of Accounting and Auditing 44–29 (2d ed. 1989) ("The allowance for credit losses should be deducted from finance receivables and an analysis of the changes in the allowance provided in the notes to the financial statements.") (Cassak Aff., Ex. D).

Armco claims the inclusion of an allowance for credit losses in arriving at total finance receivables is also a generally accepted accounting principle. L. Seidler & D. Charmichael, Accountant's Handbook 4–10 (1981) ("Accounts receivable should be valued at expected realizable value in cash, and returns and allowances should be shown as a deduction from the related receivables....") (Cassak Aff., Ex. C); Industry Audit Guide: Audits of Finance Companies 47 (AICPA 1973) ("The allowance for losses should be shown separately in the balance sheet as a deduction from the related receivables."); R. Kay & D. Searfoss, *supra*, at 44–29. Glenfed does not contest this assertion.

Alternatively, Armco argues if the term "Loan Account" merely refers to a single unit of Finance Receivables, then reserves may be considered part of a Loan Account because they are merely another "unit" of Finance Receivables.[9] One accounting reference work defines an allowance for uncollectible accounts as follows:

> **allowance for doubtful (uncollectible) accounts** A valuation account offsetting the periodic provision for estimated uncollectible accounts or bad debts; a *contra account* to *accounts and notes receivable* that reflects a reasonable estimate of the reported receivables that ul-

timately will not be collected; when specific uncollectible accounts become known, they are written off against the allowance account which has been created by charges against the revenues of previous periods. ....

W. Cooper & Y. Ijiri, *Kholer's Dictionary for Accountants* 29 1983) (Cassak Aff., Ex. A) (emphasis in original).

Armco argues if "Loan Account" merely refers to the aggregate of Finance Receivables, then reserves may be considered part of a Loan Account because they are merely another "unit" of Finance Receivables. Reference materials supplied by Armco are instructive on the relationship between receivables and allowances. *See* Industry Audit Guide, *supra* 47; L. Seidler & D. Charmichael, *supra* 4–10; R. Kay & D. Searfoss, *supra* 44–29.

In addition, the language of the Merger Agreement states "in no event shall a Credit Loss for any Loan Account exceed the amount of such Loan Account *on the Closing Date.*" Merger Agreement, § 1.17 (emphasis added). The Cash Purchase Price of AFC was calculated as of the Closing Date in terms of the net book value of AFC's assets. *Id.*, § 2.5(a). Defining a Loan Account as inclusive of the Allowance for Credit Losses for purposes of Armco's indemnification is therefore consistent with the manner in which the assets of AFC, including Finance Receivables, were valued on the Closing Date.

The conclusion to be drawn is that the plain and ordinary meaning of the term "Finance Receivables" in the definition of Loan Account is inclusive of all the terms listed thereunder, including "Allowance for Credit Losses," less the two assets explicitly excluded from section 1.26.

### E. Double Counting

Defining Finance Receivables as inclusive of the Allowance for Credit Losses is supported by Armco's argument that to

---

9. Armco does not indicate whether such a practice would be in accordance with generally accepted accounting principles. The point is not material, however, because Armco does not pro-

pose to calculate Credit Losses in this manner, but merely forwards this point as a way of showing the inconsistent logic of Glenfed's position.

exclude reserves from the definition of Credit Losses is to contradict the no double counting provision of section 9.11 of the Merger Agreement. Section 9.11 of the Merger Agreement states:

For the avoidance of doubt, the calculation of the Cash Purchase Price or any other amount hereunder shall be made so that no amount shall either be deducted more than once or added more than once.

Merger Agreement, § 9.11.

Armco argues:

Ignoring the reserves, as Glenfed argues, would mean Glenfed would receive a credit for those reserves at the beginning, when the cash purchase price was calculated, and again at the end as part of "Credit Losses."

Armco Brief at 21. Glenfed, on the other hand, claims including the reserves in the calculation of Credit Losses would result in double counting in favor of Armco, as discussed more fully below.

### 1. *Validity of Section 9.11*

■ Prior to addressing the no double-counting arguments, it is necessary to resolve the issue of the effect of section 9.11 on the other provisions of the Merger Agreement. Glenfed argues section 9.11 creates no substantive rights in the parties because it was meant to apply only to erroneous computations or drafting errors in the Merger Agreement. Glenfed Brief at 12. Glenfed attempts to support this argument by reference to the introductory language of section 9.11 which indicates the section is included "[f]or the avoidance of doubt." *Id.* It is Glenfed's contention that Armco cannot rely on the no double counting provision to create doubt where none exists by virtue of a *deliberate* double counting.

Glenfed's assertion that section 9.11 is merely "boilerplate" is rejected. The notion of a boilerplate provision in an extensively negotiated and complex document such as the Merger Agreement is contrary

to common sense. Moreover, Glenfed's assertion is contrary to the principle of contract construction that each term of an agreement is to be given meaning where possible. *Matter of Community Medical Center,* 623 F.2d 864, 866 (3d Cir.1980); *Foreman Roofing, Inc. v. United Union of Roofers, Waterproofers and Allied Workers, Local 36,* 144 Cal.App.3d 99, 107, 192 Cal.Rptr. 439, 444 (1983).

As Armco points out, if the meaning of section 9.11 is to exclude only drafting errors then section 9.11 is a meaningless provision because mutual mistakes of the parties are not enforceable and may give rise to the equitable remedy of reformation. *Universal Mortg. Co. v. Prudential Ins. Co.,* 799 F.2d 458, 469 (9th Cir.1986); *Architects & Contractors Estimating Serv., Inc. v. Smith,* 164 Cal.App.3d 1001, 1007–08, 211 Cal.Rptr. 45, 48 (1985). If the intention of section 9.11 was merely to declare drafting errors invalid, it is plain the parties could have written the no double counting provision to say just that.

### 2. *Net Book Value*

Armco maintains that valuation of the net book value of AFC's assets, which was the basis for determining the Cash Purchase Price, took into account the reserves and resulted in a corresponding reduction of the Cash Purchase Price for Glenfed. Armco's Warranties and Representations in the Merger Agreement stated that the loan accounts being sold as assets to Glenfed had either been collected or were able to be collected in the ordinary course of business *"subject to the allowance for credit losses* on the financial statements which was established in accordance with the normal credit and collection practice and experience of AFC."* Merger Agreement, § 4.12 (emphasis added).[10]

Armco argues the failure to take into account the Allowance for Credit Losses in determining the amount of Credit Losses for which Armco must indemnify Glenfed

---

**10.** Armco also relies on the fact that credit reports of Glenfed prepared after the merger reflect the specific reserves established by AFC. Armco Brief at 6 (citing Cassak Aff., Ex. F). The credit reports, however, do not appear to be part of the Merger Agreement and their consideration as a means of determining the subjective intentions of the parties is therefore barred by the parol evidence rule. *Hennefer,* 182 Cal. App.3d at 501, 227 Cal.Rptr. at 322.

results in double counting. Armco's argument is set forth in its brief:

> Take for example [a] hypothetical loan that was listed on the books of AFC at a value of $1 million, but for which AFC determined there should be a reserve of $200,000 because, taking into account a variety of factors, it determined that portion of the loan would be uncollectible. In arriving at the cash purchase price for the [Merger] Agreement, Glenfed, in accordance with the net book value concept of the Agreement, paid $800,000 for that asset ($1 million face value minus the $200,000 reserve). If Glenfed is unable to collect anything on the loan, its loss on that account is $800,000, the amount paid, not $1 million. However, the failure to take account of the reserves in calculating credit losses will result in Glenfed's taking credit for a $1 million loss for that loan.

Armco Brief at 19–20.

This argument comports with the language of section 1.17 of the Merger Agreement which states:

> Notwithstanding anything to the contrary in this Section 1.17, in no event shall *a* Credit Loss for *any* Loan Account exceed *the amount of such Loan Account on the Closing Date.*

Merger Agreement, § 1.17 (emphasis added). The Cash Purchase Price was based upon the net book value of AFC's assets as of the Closing Date. Armco argues a corresponding deduction for the Allowance for Credit Losses must be taken into account in determining Credit Losses as provided in section 1.17.

Interestingly, Glenfed does not directly contradict the double-counting argument of Armco but attempts to sidestep the issue by arguing either (1) section 9.11 is inapplicable to deliberate double-counting or (2) Armco's interpretation of the meaning of Credit Losses results in impermissible double counting in Armco's favor. Glenfed Reply at 8–15. The former argument is addressed and rejected above, the latter is discussed below.

### 3. *$5 Million Threshold*

■ Glenfed claims that the $5 million limitation on the amount of the indemnity for Credit Losses obligates Glenfed to absorb only the first $5 million in Credit Losses and no more. Glenfed Brief at 11–12. Glenfed's argument is based upon the proposition that the $5 million threshold was an expression of the amount of Credit Losses that the parties reasonably expected Glenfed actually to incur. As such, Glenfed reasons Armco's interpretation of the Reserve Issue would result in double counting of the reserves first by adding them to the amount of Credit Losses and again to the $5 million threshold. While Glenfed's argument may well be internally consistent from its subjective point of view, it does not override the objective definition of Credit Losses as disclosed by the terms of the Merger Agreement.

Glenfed claims the inclusion of the $5 million threshold in section 6.2 corresponds roughly to the portion of the reserves which were likely to be applied to Loan Accounts coming due during the two-year indemnification period. This argument proceeds as follows:

> Of the $11.2 million reserves on the balance sheet, $2.5 million were tied to accounts retained by Armco under the terms of the Merger Agreement. *See* Exhibit 1.18 to the Merger Agreement ([Glenfed Reply Brief, Ex. 1]). The remaining $8.7 million credit loss allowance covered accounts acquired by Glenfed, some of which were to come due during the two-year indemnification period and the rest thereafter. According to Note 3 to the [Balance Sheet], the AFC portfolio was structured such that approximately sixty percent of the Finance Receivables were to mature in the next two years. (*See* AFC Consolidated Financial Statement [Glenfed App., Ex. 3], Note 3 at 3). Given that structure, it is logical to infer that roughly sixty percent of the $8.7 million allowance, or roughly $5 million, was attributable to losses anticipated during the two-year indemnification period from April 1985 to April 1987.

Glenfed Brief at 12 n. 5.

Although Glenfed's explanation of the purpose of the $5 million threshold may be

convoluted, it appears to be internally consistent from Glenfed's subjective point of view.[11] The problem with Glenfed's argument is that it is wholly unsupported by the objective theory of contract and the terms of the Merger Agreement.

According to Glenfed, the amount of the $5 million threshold was related to the amount of Credit Loss reserves that Glenfed discounted from the purchase price. As mentioned previously, the Russell Certification supports this subjective view of the $5 million threshold. Even if the Russell Certification were to be considered, however, it would not change the outcome of the Reserve Issue because Glenfed's argument is merely a matter of subjective intention, while the Reserve Issue must be decided as a matter of the objective manifestation of the parties' intent as disclosed by the terms of the Merger Agreement.

Nowhere in the Merger Agreement is an explicit or direct connection drawn between the Allowance for Credit Losses and the $5 million threshold provision of section 6.2. While the plain and ordinary meaning of Credit Losses may be determined by reference to the terms of the Merger Agreement alone, Glenfed's interpretation of the $5 million threshold is not supported by the Merger Agreement. The attempt by Glenfed to inject ambiguity into the Merger Agreement by presenting evidence of a subjective understanding of the agreement does not outweigh the plain and ordinary meaning of Credit Losses.

Even accepting Glenfed's subjective interpretation of the $5 million threshold as the objective meaning of that provision, Glenfed does not address whether section 9.11 bars adoption of Armco's interpretation of the meaning of Credit Losses as reflected in the Merger Agreement. The

plain language of the no double counting provision states: "no *amount* shall either be deducted more than once or added more than once." Merger Agreement, § 9.11 (emphasis added).

Glenfed concedes the $5 million threshold is not the same amount in numerical terms as the amount of Credit Losses actually incurred by Glenfed; Glenfed contends it is merely a predetermined approximation. Additionally, the Allowance for Credit Losses and the $5 million threshold are different "amounts" in that their numerical figures (even if identical) represent different concepts: the $5 million provision is a threshold which must be passed before any claim is paid, the Allowance for Credit Losses is a before-the-fact estimation of total losses. Even if both these amounts are counted, this does not contradict the no double-counting clause of section 9.11 of the Merger Agreement. To accept Armco's definition of Credit Losses does not result in impermissible double counting in its favor.

Armco's definition of Credit Losses is supported by the plain and ordinary terms of the Merger Agreement and does not conflict with the no double counting provision of section 9.11.

*Conclusion*

For the foregoing reasons, partial summary judgment is granted in favor of Armco on the Reserve Issue. Glenfed's motion for partial summary judgment is denied.

---

11. Armco rails against Glenfed's interpretation of the purpose for the $5 million threshold, calling it "desperate," "astonishing" and "nothing more than an after-the-fact numbers game." Armco Brief at 23–26. Beyond namecalling, however, Armco does not present an explanation of section 6.2 of the Merger Agreement other than the fact that it is what is objectively reflected in the Merger Agreement. Armco argues the $5 million provision of section 6.2 was

a "basket," intended to ensure that disputes over indemnification would not involve insignificant amounts. This interpretation is not supported by the objective language of the Merger Agreement. Moreover, it is not plausible that the $5 million "basket" used in section 6.2(e) was intended to prevent minor disputes, compared with other provisions of the Merger Agreement which rely on "baskets" of $25,000 to $250,000.